505 A.2d 545

**Ronald CARTER**

**v.**

**STATE of Maryland.**

**No. 634, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

March 6, 1986.

Michael R. Braudes, Asst. Public Defender (Alan H. Murrell, Public Defender, on brief), Baltimore, for appellant.

Jillyn K. Schulze, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Kurt L. Schmoke, State's Atty. for Baltimore City, and Jonathan Shoup, Asst. State's Atty. for Baltimore City, on brief), Baltimore, for appellee.

Submitted before GILBERT, C.J., and WILNER, and ROBERT M. BELL, JJ.

WILNER, Judge.

Appellant was convicted by a jury in the Circuit Court for Baltimore City of first degree murder (art. 27, § 407 and common law) and carrying a dangerous and deadly weapon

(art. 27, § 36). He was sentenced to life imprisonment on the murder conviction and to three years on the deadly weapon conviction, with the sentences to be served consecutively.

At trial, it was apparently undisputed by appellant that he killed the victim, Kevin Smothers. His defense was that (1) the killing was in "self-defense," and (2) if not in self-defense, then he killed because of a "hot-blooded" response to provocation, a defense which would mitigate murder to manslaughter.

Appellant noted a timely appeal and before us complains that:

"I.   The trial court erred in failing to instruct the jury on the offense of manslaughter.

II.   The trial court erred in excluding evidence that the victim had shot Appellant a few months prior to the homicide.

III.  The trial court erred in permitting Appellant to be impeached on the basis of a conviction of assault with intent to murder.

IV.  The trial court erred in failing to to propound a requested *voir dire* question.

V.   The trial court erred in refusing to call Andre Farmer as a court's witness."

We find merit in two of appellant's contentions and therefore shall reverse and remand for a new trial on his murder conviction.

## I.

Appellant first contends that the trial court erred when it refused to instruct the jury on the subject of manslaughter as he requested. The exact point in dispute is whether there was sufficient evidence adduced at trial to support a manslaughter instruction based on the "Rule of Provocation."

■ As Judge Orth noted in *Whitehead v. State,* 9 Md. App. 7, 10–11, 262 A.2d 316 (1970),

"For the 'Rule of Provocation' to be invoked there are four requirements:

(1) There must have been adequate provocation;

(2) The killing must have been in the heat of passion;

(3) It must have been a sudden heat of passion—that is, the killing must have followed the provocation before there had been a reasonable opportunity for the passion to cool;

(4) There must have been a causal connection between the provocation, the passion, and the fatal act."

*See also Scott v. State,* 64 Md.App. 311, 323, 494 A.2d 992 (1985); *Cunningham v. State,* 58 Md.App. 249, 258, 473 A.2d 40 (1984). With these requirements in mind, we now turn to the evidence at hand, viewing it in the light most favorable to appellant, to determine if there was evidence from which the jury could have found that appellant killed in response to a hot-blooded provocation.

Appellant testified that at approximately 8:30 p.m. on November 21, 1983, he encountered the victim on the corner of Milton Avenue and East Hoffman Street, that the two exchanged "a few words and whatnot," and that an "altercation" arose.[1] He claimed that he and the victim "started tussling with one another," that the victim brandished a knife but that he was able to get the knife from the victim. At this point, according to appellant, he was in an enraged state, having "lost complete control" of himself, and began

---

1. Appellant testified that the altercation arose because the victim "had told me that—he had told me that he meant to kill me before, but I got away, and ... next time he ain't going to miss...." Appellant claimed that the victim had shot him in the head during the summer of 1983 and sought to introduce hospital records to substantiate that claim. Because there was no police report filed or any other evidence to show that the victim had indeed shot him, save only appellant's testimony, the court refused to allow him to establish this point, something which we will see was also error.

chasing the victim, who had apparently started to retreat once disarmed. The chase lasted some 60 to 90 seconds.

On direct examination, appellant testified that when he caught the victim, he stabbed him "[b]ecause I felt he was trying to get a gun like he usually have." [2] On cross-examination, he testified that the victim "got tired of running from me and turned to try to take [the knife] away from me." He added, in this account, that he stabbed the victim in.the upper body as the victim "rushed" him.

### 1. *Was there "adequate provocation"?*

■ For a provocation to be "adequate," it must be "calculated to inflame the passion of a reasonable man and tend to cause him to act for the moment from passion rather than reason." R. Perkins, *Perkins on Criminal Law,* at p. 56 (2d ed. 1969). *See also Wharton's Criminal Law* § 155 (C. Torcia ed. 1979). "There is adequate provocation when there is a mutual quarrel or combat. The combat is mutual if the intent to fight is mutual, and in such situations the question of which one actually strikes the first blow is not controlling.' " *Whitehead v. State, supra,* 9 Md.App. at 11, 262 A.2d 316 (quoting Perkins, *supra,* at p. 49).

In his brief, appellant's principal argument is that he and the victim engaged in a "mutual quarrel or combat." [3] In our view, his testimony recounting the "altercation" and the "tussling," though hardly indisputable, fairly generated sufficient evidence of "adequate provocation" when considered in the light most favorable to him.

---

**2.** The prosecution objected to this response and the court instructed the jury "to disregard the remark, '[l]ike he usually have'...."

**3.** Alternatively, he suggests that the legally adequate provocation consisted of "words accompanied by conduct indicating a present intention and ability [on the part of the victim] to cause the appellant bodily harm," relying on *Lang v. State,* 6 Md.App. 128, 132, 250 A.2d 276 (1969).

## 2. Was the killing in the "heat of passion"?

■ The focus of the element is subjective: did the slayer act while in the throes of actual hot-blooded passion? *See Tripp v. State*, 36 Md.App. 459, 469, 374 A.2d 384, *cert. denied* 281 Md. 745 (1977). Generally speaking, only he can attest to the "hot-blooded" nature of the killing. *Bartram v. State*, 33 Md.App. 115, 175, 364 A.2d 1119 (1976), *affirmed* 280 Md. 616, 374 A.2d 1144 (1977); *Tripp v. State, supra*, 36 Md.App. at 469, 374 A.2d 384.

Here, appellant did testify in this regard. *Compare Tripp v. State, supra.* By his own account, he was in an enraged state; he was "more or less like in a blackout," "couldn't handle what happened, what had transpired" between him and the victim, and just "lost complete control." Thus, we believe appellant adduced legally sufficient evidence to generate the question of whether he subjectively killed in the "heat of passion."

## 3. Was the killing in the "sudden" heat of passion?

■ In the analysis of this element, we are "concerned with the objective test of whether there had been a sufficient cooling time for the passions of an average and reasonable man to abate." *Tripp v. State, supra*, 36 Md. App. at 470, 374 A.2d 384.

From appellant's testimony, his passions were aroused to the boiling point during his "altercation" and "tussling" with the victim. Further, it was uncontroverted that the ensuing chase lasted some 60 to 90 seconds. In our view, this short elapse of time could hardly be deemed sufficient as a matter of law for a "hot-blooded" passion to subside and to allow for "cool deliberation." *Compare Cunningham v. State, supra*, 58 Md.App. at 259, 473 A.2d 40; *Tripp v. State, supra*, 36 Md.App. at 469, 374 A.2d 384. Indeed, a jury could find that the chase intensified the fury of appellant.

4. *Was there a "causal connection" between the provocation, the passion, and the fatal act?*

■ Lastly, the "Rule of Provocation" requires that there be some direct causal relationship between the provocation, the passion, and the fatal act. That is, "[t]he adequate provocation must have engendered the heat of passion, and the heat of passion must have been the cause of the act which resulted in death." Perkins, *supra*, at p. 69.

In the instant case, as we have pointed out in the "mutual quarrel or combat" analysis, during the "altercation" and "tussling" between the two, the victim purportedly expressed regret for being unsuccessful in a prior attempt to kill appellant, promised to be successful in his efforts next time, and apparently drew a knife on appellant during their quarrel. This, as appellant testified, evoked "hot-blooded" passion, and prompted him to fatally stab the victim after a heated chase. We hold that appellant made the requisite minimal showing necessary to generate the issue of direct causal relationship between the provocation, the passion, and the fatal act.

## II.

■ As we noted (n. 1, *ante*), appellant claimed that the victim had shot him in the head during the summer of 1983—a few months before the killing giving rise to the instant appeal—and sought to introduce evidence to that effect. The State objected, asserting that, except for appellant's "bald allegation," there was no evidence that the shooting had actually occurred. The court sustained the objection, opining that, if appellant had some basis for "alleging that he was shot by this deceased," it would be admitted into evidence, but that otherwise the incident could not be referenced. Defense counsel made a proffer of the incident, and, although no formal charges or statement had been made accusing the victim, counsel offered a hospital record to show that appellant had been treated for the injury on a certain date. In refusing appellant's testimony

as to the prior shooting we believe that the lower court erred.

As we said, appellant posited two theories intended to exculpate or mitigate the homicide—self-defense and "hot-blooded" provocation.

We agree with appellant's contention that the shooting tended to show the victim's violent proclivities and thus would be admissible in connection with the defense of self-defense to show that appellant acted reasonably. *See Thomas v. State,* 301 Md. 294, 306–07, 483 A.2d 6 (1984).

■ We disagree, however, that the prior shooting could be introduced to show that appellant went "out of control." As we pointed out in Part I, the theory of "hot-blooded" provocation requires that there be a causal relationship between the provocation (here, a mutual combat or quarrel), the "hot-blooded" passion aroused by the provocation, and the fatal act. Since the causal relationship is required, and this prior shooting could only evidence a "grudge," not the "passion" invoked by the provocation, it could not, within the confines of the "hot-blooded" response to provocation analysis, tend to prove any of the requisite elements.

Accordingly, we hold that evidence of the prior shooting was admissible for purposes of self-defense, although not with respect to the "provocation" defense.

### III.

■ Appellant's third complaint is that the trial court erred in permitting the State to impeach him on the basis of a conviction for assault with intent to murder. He argues that impeachment founded on this conviction was erroneous "because it was never established that [he] had been represented by counsel, or had been an adult, when it occurred." To support his contention, appellant relies on an isolated passage in the transcript, wherein he answered that he had been convicted of the charge by way of a "plea bargain," apparently, he says, without first being questioned as to

whether he was an adult or was represented by counsel at the time.

Quite simply, the argument is factually incorrect. Immediately before asking appellant whether he had been convicted of specific offenses—namely, robbery, escape, dayhouse breaking, and the assault with intent to murder charge complained of—the State's Attorney prefaced the area of inquiry with a question delving into the subjects that appellant claims were not established. Specifically, he asked appellant: "Mr. Carter, since your eighteenth birthday, have you been convicted of a crime where you had an attorney or waived your right to an attorney?" [4] It is clear that appellant considered and understood the State's inquiry as prefatory to each question about the specific offenses, for when the State asked about the robbery conviction appellant maintained that the conviction was overturned because he was a juvenile. In our view, the State's line of inquiry concerning appellant's prior convictions, when viewed in context, establishes the requisite foundation that appellant was an adult, and was either represented by counsel or waived his right to counsel when he was convicted of the assault with the intent to murder by way of the "plea bargain."

## IV.

■ Appellant next alleges error on the part of the lower court in refusing to ask the prospective jurors, on *voir dire* examination, "whether they had any problem with the proposition that the mere fact that a person has been charged with a crime is not evidence of guilt." Although the trial judge indicated that he would cover the point in his instructions to the jury, and did so, appellant claims that the very different purposes underpinning *voir dire* and jury instructions made the judge's ruling prejudicial error.

---

**4.** Appellant objected to that question at trial, but raises no complaint in this appeal about the court's overruling of his objection. We therefore do not address the propriety of such a general question.

In *Twining v. State*, 234 Md. 97, 198 A.2d 291 (1964), one of the requested *voir dire* questions related to whether the jury would give the accused the benefit of the presumption of innocence and the burden of proof. The Court of Appeals held that the lower court had not abused its discretion in refusing the question for *voir dire*, recognizing and following the generally accepted rule "that is is inappropriate to instruct on the law at the [*voir dire*] stage of the case, or to question the jury as to whether or not they would be disposed to follow or apply stated rules of law." *Id.* at 100, 198 A.2d 291.

The *voir dire* question requested here has all the attributes of the one held to be properly refused in *Twining*. Indeed, we believe that the instant request is squarely within the rule espoused in *Twining*, and accordingly hold that the trial judge did not abuse his discretion in refusing the request.

In any event, it appears that the substance of appellant's request was fairly covered by two other questions asked of the prospective jurors by the court:

(1) "Is there *any reason whatsoever* why you could not render a fair and impartial decision based *solely* on the evidence and the law presented to you during the course of the trial?" (Emphasis added.)

(2) "Would the race, sex, age of the defendant or witness, the nature of this case, *or any other circumstance* have any [e]ffect on your ability to render a fair and impartial verdict?" (Emphasis added.)

Moreover, the jurors are sworn to render an "impartial" verdict based on the evidence presented at trial and the law as instructed by the court.

## V.

■ Appellant's final complaint is that the lower court abused its discretion when it refused to call Andre Farmer as the "court's witness." Mr. Farmer, who initially was scheduled to be called as a prosecution witness and who

was called by the defense to testify during a preliminary suppression hearing held immediately before the trial began, apparently changed his account as to what he witnessed on November 21, 1983—the night of the killing.

Although it is not entirely clear from the record, it appears that the substance of Farmer's original story was similar to that of Reginald Evans and Kevin Brice—the two prosecution witnesses who testified that they saw appellant chase, catch, and then fatally stab Kevin Smothers. In a three-page witnessed statement dated August 29, 1984, Mr. Farmer recanted his original version of the events, and in its stead essentially maintained that appellant was "framed." He averred (1) that he had "no knowledge of the crime that took place," (2) that appellant "was not in the neighborhood or the 1400 block N. Milton Ave" at the time of the killing or at anytime that day, (3) that when anything "happens in the neighborhood, people will bring up Mr. Carter's name," (4) that Kevin Brice and Reginald Evans have "attitudes" against appellant because of some "past run-ins," and (5) that he, Brice, and Evans all came to the scene after the incident occurred, and that they "were going to send Mr. Carter to jail because he had stood up against" Evans and Brice.

The decision as to whether to call an individual as a court's witness is within the sound discretion of the court, and will not be disturbed on appeal absent an abuse of that discretion. *See Patterson v. State,* 275 Md. 563, 578, 342 A.2d 660 (1975); *Scarborough v. State,* 50 Md.App. 276, 282, 437 A.2d 672 (1981), *cert. denied,* 292 Md. 639 (1982). In *Patterson,* the Court of Appeals pointed out that the majority view is that since "the parties themselves have the primary responsibility of producing evidence, a trial judge should call a witness as a 'court witness' only when the adversary system fails to produce the necessary facts and a *miscarriage of justice would likely result." Patterson v. State,* 275 Md. at 577, 342 A.2d 660 (emphasis added.) In *Scarborough,* we analyzed the *Patterson* decision and enumerated various factors, emanating from the *Patterson*

holding, which aid in determining the necessity of calling a "court's witness." They are:

(1) The party's inability (usually the prosecutor) to vouch for the veracity of the witness;

(2) The close relationship between the witness and the defendant;

(3) The existence of contradictory or inconsistent statements by the witness;

(4) The hostility of the witness; and

(5) The necessity for the testimony, *i.e.,* where the witness possesses material evidence.

*See Scarborough v. State,* 50 Md.App. at 282, 437 A.2d 672.

*Patterson* and *Scarborough* are without doubt factually distinguishable from the case at bar because in each of those cases the prosecution asked the court to call as the "court's witness" the mother of the accused, who in each instance was "hostile" to the prosecution. Still, the principles announced in those cases provide the analytical framework for the instant case.

Although appellant's counsel noted that he was unable to vouch for the credibility of Farmer, and, as we said, Farmer apparently made inconsistent statements, it remains that Farmer was not seemingly "hostile" to appellant, and that there was no close relationship between the two. *Compare Patterson v. State, supra; Scarborough v. State, supra.* Moreover, since Farmer's latest version was that he was not present at the crime scene, it appears that the import of his testimony rested solely on his claim that Evans and Brice had "framed" appellant and thus that their stories were not credible. In essence, his only apparent input was that of impeachment evidence.

We note that defense counsel considered calling Farmer, and indeed a *voir dire* examination was conducted outside the presence of the jury, but that appellant withdrew the request for Farmer to testify. This was apparently a tactical decision, for Farmer's assertion that appellant was not even in the neighborhood seemingly conflicted with

appellant's theories of self-defense and "hot-blooded" provocation.

On balance, we find that the court did not abuse its discretion in refusing to call Farmer as a "court's witness."

For the reasons we have set forth in Parts I and II of this Opinion, appellant's murder conviction must be reversed and remanded for a new trial. As for his deadly weapon conviction, we have found no error that would affect its validity; accordingly, it is affirmed.

JUDGMENT OF MURDER IN THE FIRST DEGREE (INDICTMENT NO. 18335420) REVERSED AND REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR A NEW TRIAL; JUDGMENT FOR CARRYING A DANGEROUS AND DEADLY WEAPON (INDICTMENT NO. 18335421) AFFIRMED; COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.