632 A.2d 783

**Wesley E. BAKER**

v.

**STATE of Maryland.**

**No. 150, Sept. Term, 1992.**

Court of Appeals of Maryland.

Nov. 12, 1993.

544

Nancy S. Forster, Asst. Public Defender, (Stephen E. Harris, Public Defender, and Michael R. Braudes, Asst. Public Defender, all on brief), Baltimore, for appellant.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

CHASANOW, Judge.

We are called upon to decide the propriety of decisions made by the judge (Whitfill, J.) during the guilt and death-penalty sentencing phases of Wesley Eugene Baker's first degree murder trial in the Circuit Court for Harford County. The first question before this Court is whether the trial judge abused his discretion by not calling two individuals as the court's witnesses at the sentencing hearing. The second is whether the judge abused his discretion by admitting "victim impact" testimony that included hearsay statements made by the victim's family members. The third issue is whether the trial judge's jury instructions, regarding first degree murder, were adequate in light of our recent holding in *Willey v. State*, 328 Md. 126, 613 A.2d 956 (1992). The fourth and final issue is whether there was sufficient evidence to permit a finding that the Defendant was a principal in the first degree in the murder of Jane Tyson. For the reasons stated below, we affirm the jury's verdict and the death sentence imposed by the trial judge.

## I. Facts

On the evening of June 6, 1991, the victim, Jane Tyson, went to Westview Mall with her four-year-old granddaughter, Carly, and her six-year-old grandson, Adam. At approximate-

ly 9:00 p.m. that evening, the victim's husband, John Tyson, was notified that his wife had been shot.

Wesley Eugene Baker was indicted for the murder and the State filed a notice of its intent to seek the death penalty pursuant to Maryland Code (1957, 1992 Repl.Vol.), Article 27, § 412(b)(1)(i). At Baker's trial, a stipulation of Adam's testimony was admitted into evidence. The stipulation stated that as Carly, the victim, and Adam were getting into their automobile, a man ran up to them. Adam heard Ms. Tyson scream "No," the man shot her in the head, and Adam saw blood coming out of her mouth. The man then ran to a blue Chevrolet S–10 Blazer, entered it, and the truck pulled away from the scene.

Chief Deputy Medical Examiner, Dr. Ann M. Dixon, testified that the gunshot wound that killed Jane Tyson was a "contact wound, meaning that the end of the gun was up against the deceased's ear at the time it was discharged...." Dr. Dixon also testified that Tyson died from the single wound to the left side of her head.

Carolyn Davis, another patron of the mall, testified that she was in the parking lot when she heard the gunshot and saw Adam running toward her. Adam told Ms. Davis that his grandmother was dead. Davis then went to Tyson's car where she saw the victim on the ground with blood coming from her head.

Another witness for the State, Scott Faust, testified that he was driving by the mall when he saw the blue Blazer parked in the lot. Faust saw a man enter the driver's side of the Blazer, followed by another man who ran from a nearby car and jumped into the passenger side of the truck before it sped out of the parking lot. Faust followed the Blazer, wrote down the license tag number, and observed the occupants through the truck's rolled-down windows. Faust returned to the mall parking lot and gave a description of the men to the police who had arrived at the scene. Faust positively identified the Appellant, Wesley Eugene Baker, at a police "show-up" later

that evening. Faust also made a positive in-court identification of Baker during trial.

Baltimore County Police Officer Frank Barile testified that he and Officer Nick McGowan were on duty in an unmarked police cruiser on Security Boulevard when the suspect vehicle drove past them. The officers activated their emergency lights and pursued the vehicle at a high rate of speed until it turned onto Old Frederick Road and pulled to the right side of the roadway, where the passenger fled from the truck. Officers Barile and McGowan stopped the vehicle and placed the driver, Gregory Lawrence, under arrest. Following his flight from the vehicle, Wesley Eugene Baker was also arrested by Officer James Conaboy. One of the arresting officers at the scene, Officer William Harmon, noticed what appeared to be blood splattered on Baker's sock and shoe. Officer Conaboy then lifted Baker's pants' leg and the officers discovered blood on his shoe, sock, and leg. Upon a visual inspection of Gregory Lawrence, no blood was observed on any of his clothing. The blood found on Baker was later identified, by a serology comparison and positive DNA test, as that of Jane Tyson.

Officer Barile and a fellow officer searched the area where Baker exited the Blazer and found a white purse and an empty plastic card holder on the ground. Tyson's wallet was also found in the area by another officer. Both the purse and the wallet were identified at trial as belonging to Jane Tyson. Incident to the arrest, Officer Barile searched the Blazer and found Tyson's "MOST" bank card on the passenger-side floorboard. Finally, there was testimony at trial that Baker's fingerprints were found on the driver's side door and window of Jane Tyson's car.

On October 26, 1992, in the Circuit Court for Harford County, a jury found Baker guilty of first degree premeditated murder, felony murder, robbery with a deadly weapon, and the use of a handgun during the commission of a felony. By a special verdict, the jury also found Baker was a principal in the first degree. Baker then elected to be sentenced by

Judge Cypert O. Whitfill.[1]

At the subsequent sentencing hearing, the State incorporated all of the evidence from the trial and also introduced Baker's prior criminal record. The record revealed prior criminal convictions for unauthorized use in 1975 and 1978, two 1979 convictions for robbery with a deadly weapon, and a 1989 conviction for unlawful possession of a pistol and a controlled dangerous substance. At the time of the murder, Baker had been on parole for less than nine months. The State also presented testimony from John Tyson as to the impact the victim's death had on him and on other members of their family.

Appellant presented testimony from Paul Davis, Chairman of the Maryland Parole Commission, and Dr. Robert Johnson, an expert in criminal justice and prison adjustment. Defense counsel then informed the court that, pursuant to their client's instructions, they did not intend to call Baker's mother or Lori James, a social worker who prepared a history of Baker's family, to testify on Baker's behalf. Defense counsel offered the following reason for this decision:

> "Mr. Baker has, as I have said, directed us to not call either of those two witnesses, and I think it's fair to say that I understand, in a sense, why, because there were going to be very painful kinds of things testified about. But we have to respect ... Mr. Baker's very clear, unequivocal and express directions to us, and therefore, we will not be calling those two witnesses...."

The judge responded, "I certainly have a concern, from my standpoint, of not hearing anything about Mr. Baker's social background." At which point, the judge stated his inclination to call the individuals as court's witnesses and he invited both State and defense counsels' comments. Defense counsel offered the following response:

---

1. Upon defense counsel's request at the sentencing hearing, Judge Whitfill made his own independent determination as to whether Baker was a principal in the first degree. This issue was properly determined at the sentencing hearing. *See* Maryland Rule 4–343.

"Your Honor, two comments. One, in our judgment, as an officer of the Court, we have to recognize that the Court has the common law power to call any witness the Court desires on making a determination on anything.

The second comment is, if asked, Mr. Baker will indicate in person, before Your Honor, now that he does not wish you to call those two individuals as Court's witnesses."

The record also indicates the judge was initially informed that Baker refused to offer the testimony because it would prove embarrassing to his family. The judge recognized, however, that "[i]f it's a tactical decision ... I think that decision should and must rest with the Defendant. As I understand it, that's not what's coming forward."

After further discussion, the following colloquy took place between the judge and Mr. Baker:

"THE COURT: Mr. Baker, my inclination, at this moment, is to ask those witnesses to testify, recognizing that information may come out which could be painful to you or painful to other members of your family, but also looking at the reality of the decision that I have to make, literally, whether or not you live or die, and that whatever pain that your family is suffering from the information coming out, in my judgment, is not apt to be more painful than it would be if I imposed a sentence of death and did not have the information, and the feeling that had they overridden your choices, that at least that would have been considered.

So, I am at a loss as to believe that any more pain can be inflicted on your family than a sentence of death without their having had the opportunity to speak.

Do you wish to comment?

THE DEFENDANT: Yes. *I feel like the information will be more damaging than helpful to me.*

THE COURT: Say that again.

THE DEFENDANT: *I feel as though the information would be more damaging than helpful towards me and my case.*

THE COURT: Is that your reason for asking [that] I not do this? Because you believe it is more damaging?

THE DEFENDANT: That reason and personal reasons." (Emphasis added).

The judge thereafter decided he would not call either individual to testify. Baker also knowingly and intelligently waived his right of allocution. Following closing arguments, and after weighing all the factors and giving the case careful consideration, the judge imposed a sentence of death.

## II. Court's Witnesses

■ Appellant contends that the trial court abused its discretion by refusing to call, as court's witnesses, Baker's mother, Ms. Williams, and Lori James, a social worker who prepared an extensive background of Baker's family. Preliminarily, we note that "it lies within the sound discretion of the trial judge whether to call a person to testify as a court witness and that decision will not be reversed absent a clear abuse of discretion." *Thomas v. State*, 301 Md. 294, 312, 483 A.2d 6, 15 (1984) (citing *Patterson v. State*, 275 Md. 563, 581, 342 A.2d 660, 670–71 (1975) and *Scarborough v. State*, 50 Md.App. 276, 282, 437 A.2d 672, 676 (1981), *cert. denied*, 292 Md. 639 (1982)), *cert. denied*, 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985). This Court has stated that questions relating to a trial court's discretion "are much better decided by the trial judges than by appellate courts, and the decisions of such judges should only be disturbed where it is apparent that some serious error or abuse of discretion or autocratic action has occurred." *Northwest'n Nat. Ins. Co. v. Rosoff*, 195 Md. 421, 436, 73 A.2d 461, 467 (1950).

Analyzing appellate review of discretionary decisions for the Court of Special Appeals in *Thodos v. Bland*, 75 Md.App. 700, 542 A.2d 1307, *cert. denied*, 313 Md. 689, 548 A.2d 128 (1988), Judge Robert M. Bell succinctly stated the following principle:

"[W]hen the consequences of a particular exercise of discretion are clear, *i.e.*, one result is clearly unjust and the other, clearly not, the limits of the exercise of discretion are

narrow. On the other hand, when the consequences are not so clear, *i.e.*, no result is clearly just or unjust, the limits of the exercise of discretion are considerably broader."

75 Md.App. at 712, 542 A.2d at 1313 (citation omitted). In the instant case, Baker made the decision not to call two witnesses, Lori James and his mother, but claims that the trial judge abused his discretion by not calling these two individuals as court witnesses and thereby accepting Baker's assertion that the witnesses' testimony might prove damaging. We reject this contention for a number of reasons.

First, prior to the 1988 enactment of Maryland Rule 1–501 (effective January 1, 1989), a principal reason a trial court called a witness itself was when neither of the parties could "vouch" for the witness's veracity and the witness possessed information material to the cause of action. Because of this so-called "voucher rule," a party might request that the judge call an individual as a court witness and conduct the direct examination since a party could not call and then impeach its own witness. *See Patterson*, 275 Md. at 568–69, 342 A.2d at 664 (explaining that, "[i]n those cases where neither the prosecution nor the defense is willing to vouch for the veracity of the witness and the witness appears to possess material evidence[,] the invocation of the procedure is generally held to be within the sound discretion of the trial court; some courts limit the procedure to those cases where material injustice would otherwise result"). In such situations, both the State and defense were then afforded opportunities to cross-examine and impeach the court's witness.

Rule 1–501 abrogated the common-law voucher rule and permitted ."[t]he credibility of a witness [to] be attacked by any party, including the party calling the witness," thus eliminating the need for the court to call witnesses under these circumstances.[2] In *Spence v. State*, 321 Md. 526, 583

---

**2.** Maryland Rule 1–501 is a verbatim adoption of Federal Rule of Evidence 607. The Committee Note appended to Rule 1–501 reads as follows:

A.2d 715 (1991), this Court reiterated the fact that the voucher rule was abolished in 1989 by Rule 1–501. The *Spence* Court also asserted that "the need for calling one as a court's witness has been greatly reduced, if not eliminated." 321 Md. at 528 n. 1, 583 A.2d at 716 n. 1. *See also Brown v. State,* 80 Md.App. 187, 191 n. 1, 560 A.2d 605, 607 n. 1 (1989) (stating that Rule 1–501 "eliminates the common law 'voucher' rule and obviates the need for court's witnesses"). Finally, relying on the holding in *Spence,* the Court of Special Appeals later stated that "the need to call a court's witness, at least insofar as fact witnesses are concerned, simply 'no longer exists' for most purposes." *Nance v. State,* 93 Md.App. 475, 485, 613 A.2d 428, 433 (1992) (quoting *Wright v. State,* 89 Md.App. 604, 610 n. 3, 598 A.2d 1214, 1217 n. 3 (1991), *cert. denied,* 325 Md. 620, 602 A.2d 711 (1992)).

Although other reasons for calling a court's witness may exist, a principal reason the court would do so has been eliminated by Rule 1–501. In addition, to say that a trial court has discretion to call its own witness is not the same as imposing upon that court a duty to call such a witness.[3] *See Carter v. State,* 66 Md.App. 567, 577–80, 505 A.2d 545, 551–52 (1986) (concluding that court's failure to call a witness in murder trial clearly was *not* an abuse of discretion). Furthermore, if Judge Whitfill violated Baker's clearly expressed desire not to call these two witnesses, and their testimony did prove damaging, there might be substantial grounds for reversal.

---

"This Rule eliminates the common law 'voucher' rule. It is not intended to otherwise affect existing law concerning the court's discretion to control direct and cross examination."

**3.** *See* 1 *McCormick on Evidence* § 8, at 26 n. 16 (John W. Strong ed., 4th ed. 1992) ("There has been a suggestion that in some cases, in the interest of justice, the judge may have the duty as well as the power to call witnesses and hence may be reversed for a failure to do so. But efforts at reversal on this ground have been unavailing.... And Wigmore denies the existence of a duty. 9 [John H.] Wigmore, Evidence § 2484 (Chadbourn rev. 1981). Fed.R.Evid. 614(a) states that the judge *may* call witnesses...." (Emphasis in original) (citations omitted)).

In addition, although they freely discussed the matter, neither the State nor the defense specifically requested that the court call Ms. Williams or Ms. James as court's witnesses. In fact, Judge Whitfill originally raised the possibility of calling these two witnesses himself, recognizing the difficulties this issue presented:

"Let me tell you what I was toying with, or the thought [that] had crossed my mind, was to call in the two witnesses as the Court's witnesses. I think the Court's entitled to have information, and I am not sure to what extent the Defendant has the right to say I will deny the Court that information.

I invite counsel's comments on such a thought. It's not a ruling. It's a thought.

\*　　\*　　\*　　\*　　\*　　\*

I certainly have, in less serious cases, without asking a Defendant what do you think, called on the Defendant's parents and said I want to hear from you. I never had anybody object to it, and say you can't do this. I am in control. So, it's a new situation that I face. And yet, my natural instincts are to say that I want to hear from these two people, and that I think I have a right to hear, and that Mr. Baker might as well convince me that I should not do that even after I express that as my natural inclination."

Appellant's brief raises the argument that "the court improperly left to [Baker himself] the decision of whether or not the testimony of Lori James and [Baker's] mother was mitigating or damaging. Such a decision is one that must be left to counsel's determination." Instead of calling the witnesses, however, defense counsel acquiesced in Baker's desire not to call either individual to testify. If Baker's attorneys believed it was within their purview to decide whether the witnesses should or should not be called, as a tactical or strategic matter, then they could have called the witnesses.[4]

---

4. There was some discussion during oral argument in this case that trial counsel refrained from calling the witnesses because they did not

Upon reflection, the sentencing judge recognized his discretion to call the witnesses and decided not to do so. The judge stated his decision as follows:

"It would appear to me, then, in view of Mr. Baker's having stated that, in his opinion, this evidence could be damaging, it takes it out of the area where ... I should exercise discretion and call those witnesses as Court's witnesses."

The judge exercised his discretion properly, respecting the Defendant's clearly stated belief that the testimony would not only be embarrassing to him and his family but also potentially damaging to his case. It is also important to note that the defense raised no objection to Judge Whitfill's decision not to call the witnesses, nor did the Defendant's attorneys indicate any disagreement with the Defendant's statement that the testimony might be damaging.

To adopt Baker's argument would place future sentencing judges in an untenable dilemma. Either risk reversal by not calling witnesses where there is a suggestion that the testimony might prove damaging or, alternatively, risk reversal by calling such witnesses if the testimony does, in fact, prove damaging. In addition, criminal defendants facing the death penalty would be able to partially shift the burden to the court to call potentially mitigating witnesses.

■ Baker also claims that the sentencing judge's failure to call these witnesses constituted cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution and Articles 16 and 25 of the Maryland Declaration of Rights, because he failed to make an individualized

---

wish to damage their relationship with the Defendant and, therefore, the court should have exercised its discretion by stepping in and calling the witnesses on defense counsel's behalf. In Appellant's brief, he also argues that it should be counsel's, and not the Defendant's, decision whether or not these individuals should testify. Because counsel acquiesced in Baker's decision, we need not address whether calling such witnesses constitutes a tactical or strategic decision ordinarily made by counsel, even to the exclusion of the Defendant's personal desires, or whether it is so personal a choice that it is one for the Defendant alone to make.

determination that death was the appropriate penalty. Baker ignores the fact that Judge Whitfill did make an individualized determination regarding Baker's sentence, considering testimony offered on Baker's behalf by the Chairman of the Maryland Parole Commission and an expert in criminal justice and prison adjustment. Therefore, we find Baker's constitutional argument without merit.

The State also suggested that because Judge Whitfill heard the testimony of Lori James at a subsequent hearing on a motion for modification of the sentence, held on May 10, 1993, this rendered his original decision "harmless error." [5] Because we find no error in Judge Whitfill's original decision not to call Ms. James and Ms. Williams, we need not reach the harmless error issue.

### III.  Victim Impact Testimony Containing Hearsay

Appellant next contends that the trial judge abused his discretion by admitting "victim impact" testimony from the murder victim's husband, John Tyson, which included hearsay statements made by other family members.[6] We reject this contention on two independent bases: (i) many of the witness's statements fall within the firmly rooted hearsay exception for relevant statements regarding a declarant's state of mind; and (ii) if any error exists at all, it is harmless beyond a reasonable doubt because the sentencing judge explicitly stated he was not relying upon any of the victim impact testimony.

---

5.  At the conclusion of Ms. James's testimony at the May 10, 1993 hearing, defense counsel advised the court that it was not likely Ms. Williams would appear to testify at the hearing or at any later date.

6.  Maryland Code (1957, 1990 Repl.Vol., 1993 Cum.Supp.), Article 41, § 4–609(d), requires that "[i]n any case in which the death penalty ... is requested under Article 27, § 412, a presentence investigation, including a victim impact statement, shall be completed by the Division of Parole and Probation, and shall be considered by the court or jury before whom the separate sentencing proceeding is conducted...." The issue of what may be properly contained in the written victim impact statement is not before this Court and we, therefore, render no decision concerning that matter.

Notwithstanding the fact that any possible error was harmless, most of the hearsay statements testified to by John Tyson were properly admitted under the hearsay exception for statements of a declarant's state of mind. Without unnecessarily reciting the entire sum of John Tyson's testimony, Baker primarily objects to the following specific hearsay statements:

"The girls talked about their grandmother and [she] visited them and had a nice relationship with them.

\* \* \* \* \* \*

In trying to tell the impact it had on [Jane Tyson's daughters], I will talk about them as daughters and as a mother of their own children. Each of the girls has shared with me, personally, and also through observations, their pain.

\* \* \* \* \* \*

We all talk about our fears of going shopping, what would be safe, could it happen again, will the children be safe.

[Tyson's daughters] talk about their part of childhood that was so important for them and so rich in their relationship with their grandmother, and they feel the injustice of not having the grandchildren's grandmother for them.

\* \* \* \* \* \*

Karen [one of Tyson's daughters] related to me one day when she was shopping with Carly and Adam for shoes, they said, 'This is Gammy's job. Gammy should be doing it.' Brent told Tammy he couldn't remember what Gammy sounded like.

\* \* \* \* \* \*

Susan [one of Tyson's daughters] tells me that Mallory starts to talk about her Gammy a little bit now, and always remembers her in her prayers."

Baker specifically contends that Md.Code (1957, 1992 Repl.

Vol., 1993 Cum.Supp.), Art. 27, § 413(c),[7] as interpreted by the Court of Appeals in *Tichnell v. State,* 290 Md. 43, 427 A.2d 991 (1981), prohibits the admission of this hearsay because it bears "insufficient indicia of reliability to be admissible in a sentencing proceeding," especially if the hearsay declarants are available to testify. Maryland law, says the Appellant, is clear that, "while the strict rules of evidence do not apply at a sentencing proceeding, unreliable hearsay is inadmissible." The latter principle is sound but what Appellant fails to acknowledge is the firmly rooted hearsay exception for a declarant's state of mind. As one author has observed:

> "Maryland recognizes ... the common law hearsay exception for statements of the declarant's 'state of mind,' regardless whether the declarant is available to testify. Under this exception, a statement of the declarant's then existing state of mind is admissible to prove the truth of the matter asserted, except that it is generally inadmissible (except in will and probate cases) to prove a fact which purportedly happened before the statement was made."

6 Lynn McLain, *Maryland Evidence* § 803(3).1, at 356–57 (1987) (footnotes omitted).

Appellant's reliance upon *Tichnell v. State,* 290 Md. 43, 427 A.2d 991 (1981), is misplaced. The issue in *Tichnell* centered around the constitutionality of permitting the State to read portions of the Defendant's trial transcript to a new sentencing jury charged with the duty of deciding whether to impose a death sentence.[8] *See Tichnell,* 290 Md. at 48, 427 A.2d at 993. Baker correctly asserts the *Tichnell* case's conclusion that "§ 413(c) does not permit, over timely objection, the admission in evidence before a new sentencing jury of the

---

7. Md.Code (1957, 1992 Repl.Vol., 1993 Cum.Supp.), Art. 27, § 413(c), shall be referred to hereafter as § 413(c).

8. Following Tichnell's jury trial and conviction for first degree murder, a new jury was required due to the Court of Appeals vacating a death sentence imposed by the original trial judge, and remanding the case for a new sentencing proceeding under § 413. *Tichnell v. State,* 290 Md. 43, 45, 427 A.2d 991, 992 (1981).

prior recorded trial testimony" where the unavailability of the witness is not shown. 290 Md. at 63, 427 A.2d at 1001. On the other hand, Maryland law is replete with cases upholding the hearsay exception for statements regarding the declarant's state of mind. *See Maryland Paper Prods. Co. v. Judson*, 215 Md. 577, 590–91, 139 A.2d 219, 226 (1958) (holding it reversible error not to permit deceased's hearsay statement that, on the morning of fatal accident, he intended to stop on the way to work and pick up a gear wheel for appellant-employer's machine; evidence was admissible to show deceased's intentions); *Tittlebaum v. Pennsylvania R.R.*, 167 Md. 397, 402, 174 A. 89, 91 (1934) (holding one boy's testimony admissible regarding statement of a companion that he intended to throw a brick at a train and " 'bust a window' ").

▇▇▇ Most of the relevant hearsay statements, testified to by John Tyson at the sentencing hearing, fall within this well-established exception. Tyson testified that particular family members shared with him their fears, pain, and concerns. In one instance, Mr. Tyson did testify to hearsay within hearsay when he discussed what Jane Tyson's daughters shared with him concerning Ms. Tyson's grandchildren:

> "Karen [one of Tyson's daughters] related to me one day when she was shopping with Carly and Adam for shoes, they said, 'This is Gammy's job. Gammy should be doing it.' Brent told Tammy he couldn't remember what Gammy sounded like.
>
> \*      \*      \*      \*      \*      \*
>
> Susan [one of Tyson's daughters] tells me that Mallory starts to talk about her Gammy a little bit now, and always remembers her in her prayers."

Although most material portions of Mr. Tyson's overall testimony were admissible, these hearsay-within-hearsay statements may have been objectionable. This in no way provides a remotely sufficient basis for reversal of the sentence imposed because any possible error was harmless beyond a reasonable doubt.

When Judge Whitfill imposed sentence upon Baker, he stated the following regarding the victim impact testimony provided by Mr. Tyson:

"In doing this, *let me say that I do not rely upon the victim impact statements.* I don't care whether the grandmother was a wonderful grandmother and a wonderful mother, whether she was an average mother, or average grandmother, or even if she was mediocre. When we cannot take our grandchildren shopping without the risk that someone will blow our brains away for the sake of our wallet or our purse, we have a problem. So, I cannot believe that under any circumstances that the mitigation, even if [it] were found to exist, that the aggravating factor does not outweigh that." (Emphasis added).

It is categorically clear that Judge Whitfill did not rely upon the victim impact testimony offered by John Tyson, and the sentence was based upon independent grounds without regard to the hearsay objected to by Baker on appeal. Even if the admission of some portions of this hearsay was erroneous, because the statements did not otherwise fall within an accepted hearsay exception, it is harmless beyond a reasonable doubt and does not warrant reversal under these circumstances. *See United States v. Jones,* 542 F.2d 186, 204 (4th Cir.), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 376 (1976) and *Ramsey v. State,* 239 Md. 561, 565, 212 A.2d 319, 321 (1965) (both applying harmless error to admission of arguably impermissible hearsay statement); *Vandegrift v. State,* 82 Md.App. 617, 636–37, 573 A.2d 56, 65, *cert. denied,* 320 Md. 801, 580 A.2d 219 (1990) (concluding that curative instruction dispelled any prejudice to defendant from admission of hearsay).

In a final challenge to the constitutionality of admitting this hearsay evidence, Appellant relies on the following language extracted from *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988):

"With respect to findings of guilt on criminal charges, the Court consistently has followed the rule that the jury's verdict must be set aside if it could be supported on one

ground but not another, and the reviewing court was uncertain which of the two grounds was relied upon by the jury in reaching the verdict. In reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds. See, *e.g.*, *Lockett v. Ohio*, 438 U.S. [586,] 605, 98 S.Ct. [2954,] 2965 [57 L.Ed.2d 973] [1978]. ('[T]he risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty . . . is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments'); *Andres v. United States*, 333 U.S. 740, 752, 68 S.Ct. 880, 886, 92 L.Ed. 1055 (1948) ( . . . 'In death cases doubts such as those presented here should be resolved in favor of the accused')."

*Mills*, 486 U.S. at 376–77, 108 S.Ct. at 1866, 100 L.Ed.2d at 395. In Appellant's case, the sentencing judge's conclusion clearly "rested on proper grounds" and any doubts that did exist were " 'resolved in favor of the accused.' " *Id.*

Judge Whitfill abided by the capital sentencing mandates of Maryland Rule 4–343, regarding the enumeration of aggravating and mitigating circumstances contributing to the decision to impose a particular sentence.[9] He found proof beyond a reasonable doubt that Baker committed the murder while

---

**9.** Maryland Rule 4–343 provides in pertinent part as follows:

"**(a) Applicability.**—This Rule applies whenever a sentence of death is sought under Code, Article 27, § 413.

**(b) Statutory Sentencing Procedure.**—When a defendant has been found guilty of murder in the first degree, the State has given the notice required under Code, Article 27, § 412(b)(1), and the defendant may be subject to a sentence of death, a separate sentencing proceeding shall be conducted as soon as practicable after the trial pursuant to the provisions of Code, Article 27, § 413.

**(c) Judge.**—Except as provided in Rule 4–361, the judge who presides at trial shall preside at the sentencing proceeding.

**(d) Allocution.**—Before sentence is determined, the court shall afford the defendant the opportunity, personally and through counsel, to make a statement.

**(e) Form of Written Findings and Determinations.**—Except as otherwise provided in section (f) of this Rule, the findings and determinations shall be made in writing in the following form [entitled *'FINDINGS AND SENTENCING DETERMINATION,'* and listing aggravating and mitigating circumstances]. . . ."

attempting to commit a robbery. *See* Md. Rule 4–343(e) (Section III, aggravating factor number 10, states that "[t]he defendant committed the murder while committing or attempting to commit robbery, arson, rape in the first degree, or sexual offense in the first degree").

Further, Baker was given the benefit of any doubt concerning one of the mitigating factors itemized by defense counsel in reliance on Rule 4–343. In Section IV of the Rule 4–343 form, mitigating factor number 7 reads as follows: "It is unlikely that the defendant will engage in further criminal activity that would constitute a continuing threat to society." Even though the judge found this factor was not proven, based upon a preponderance of the evidence, he stated the following:

"I will assume, for the moment, that the mitigation as listed in number seven, if I had found [it] to exist, that a weighing process would have been required. So, under the assumption that someone might feel that Dr. Johnson's testimony should have been accepted as proving mitigation, I will review the weighing factors that I would have gone through had I found that to exist."

As a result, *Mills* does not provide the Appellant with any persuasive arguments for reversal. The sentencing judge had ample grounds for imposing the sentence as he did, and he weighed the only mitigating factor that posed the remotest doubt in his mind before making a final decision. In light of this analysis, we hold that significant portions of the hearsay in question were properly admitted under the state-of-mind exception and, even if admitting some portions represented an error, that error was harmless and the statements were not relied upon by the sentencing judge.

### IV. Jury Instructions Regarding First Degree Murder

Appellant next contends that the trial judge erred in his jury instructions regarding first degree murder. This contention is based primarily upon the following two suppositions: (i) the trial judge erred in giving the jury an instruction that was inconsistent with our recent holding in *Willey v. State,* 328

Md. 126, 613 A.2d 956 (1992); and (ii) the instruction given allowed the jury to improperly rely upon the intensity and effect of the victim's wound in order to determine whether premeditation and the intent to kill existed at the time of the shooting.

## A.

■ Relying upon Maryland Rule 4–325(e), Appellant urges this Court to "take cognizance of any plain error in the instructions, material to the rights of the defendant," *id.*, despite his failure to lodge any objection to the instructions given at trial.[10] *See Johnson v. State*, 310 Md. 681, 686, 531 A.2d 675, 677 (1987) ("Although the trial court's failure to give a requested instruction *may* constitute error, ... such error is ordinarily not preserved for appellate review unless the requesting party objects after the trial court instructs the jury." (Emphasis added)). Because we find that the trial judge committed no error, there is no need to determine whether there exists a "plain" error so egregious as to warrant reversal absent preservation of Baker's right to appeal the issue under Rule 4–325(e). On occasion, in a capital case, we have reviewed questions concerning jury instructions before determining whether the issue has been adequately preserved for appeal. *See Bruce v. State*, 328 Md. 594, 611, 616 A.2d 392, 400–01 (1992). We shall, therefore, discuss Appellant's argument.

Baker argues that the jury instructions failed to emphasize the differences between first and second degree murder sufficiently enough so the jury could draw a clear distinction

---

**10.** In total, Maryland Rule 4–325(e) provides as follows:

"**(e) Objection.**—No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury. An appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object."

between the two degrees. In respect to this argument, Appellant stated the following:

"Assuming without conceding that Mr. Baker was the perpetrator, he fired a single shot at a stranger in the course of an offense the primary purpose of which was clearly not, as in *Willey,* to terminate the life of the victim. The jury if properly instructed could well have concluded that there was an absence of any conscious weighing of the reasons for and against the shooting, but instead only a spur-of-the-moment decision based upon a moment's panic-induced thought. The propounding of an instruction consonant with this Court's concerns as expressed in the *Willey* opinion was therefore particularly necessary and appropriate."

Appellant fails to acknowledge, however, that at trial he not only acquiesced in these instructions but, in fact, specifically requested essentially identical instructions. Prior to trial, Defense counsel requested the Maryland Pattern Jury Instructions found in Chapter 4:17, which are as follows:

## "FIRST DEGREE MURDER

First degree murder is the intentional killing of another person with wilfulness, deliberation and premeditation. In order to convict the defendant of first degree murder, the State must prove:

(1) that the conduct of the defendant caused the death of *(victim);* and

(2) that the killing was wilful, deliberate and premeditated.

Wilful means that the defendant actually intended to kill the victim. Deliberate means that the defendant was conscious of the intent to kill. Premeditated means that the defendant thought about the killing and that there was time, though it need only have been brief, for the defendant to form the intent to kill. The premeditated intent to kill must be formed before the killing."

Maryland Pattern Jury Instructions—Criminal 4:17, at 217 (1991).

The pertinent parts of the jury instructions given by Judge Whitfill are as follows:

"In order to convict the Defendant of First Degree Murder, the State must prove: (1) that the conduct of the Defendant caused the death of Jane Tyson; and (2) that the killing was willful, deliberate and premeditated.

Willful means that the Defendant actually intended to kill Jane Tyson. Intent is a state of mind and ordinarily cannot be proven directly, because there is no way of looking into a person's mind. Therefore, a Defendant's intent may be shown by surrounding circumstances. In determining the Defendant's intent, you may consider the Defendant's acts, as well as the surrounding circumstances. Further, you may, but are not required to, infer that a person ordinarily intends the natural and probable consequences of his acts and/or omissions.

Whether the Defendant intended to kill Jane Tyson may be proven by circumstantial evidence. Very important circumstantial evidence which you should consider is the act itself which caused the death. If you find that Jane Tyson's death was caused by the use of a deadly weapon against a vital part of her body, you may infer that the Defendant intended to kill Jane Tyson. Intention to kill, then, may be shown by proof that the act which caused the death of Jane Tyson had, as its natural result[,] either death or serious bodily injury.

Deliberate means that the Defendant was conscious of the intent to kill. Showing that the act was deliberate requires proof that the act causing the death was not committed suddenly, but, instead, was done after a conscious decision was made to carry out the act.

Premeditated means that the Defendant thought about the killing and that there was time, even if brief, for the Defendant to form the intent to kill. The premeditated intent to kill must be formed before the killing.

Premeditation requires proof that the conscious and deliberate intention to do the fatal act existed for an appreciable time before the act was done. The law does not require that the intention to kill exist for any considerable length of time before the fatal act was done; it is sufficient if there is time for the mind to think and consider the act and then determine to do it.

The intensity and effect of a wound may provide adequate evidence of a premeditated and determined effort, not simply to harm, but to destroy any semblance of life remaining in Jane Tyson. If the killing stems from a choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder.

Applying these definitions to the facts of this case, if you find that the State has proven beyond a reasonable doubt that the Defendant intentionally killed Jane Tyson and that this intentional killing was done with deliberation and with premeditation, then your verdict should be guilty of Murder in the First Degree—Premeditated and Deliberate."

Thus, Judge Whitfill's instructions to this jury were, if anything, a substantially enhanced version of what defense counsel requested.

Even though the trial judge in the instant case did not expressly rely upon the decision in *Willey* (which was rendered only thirteen days before he gave the jury instructions at issue),[11] his instructions were entirely consonant with this Court's concerns as expressed in the *Willey* opinion. In *Willey*, this Court stated our belief that, "it would be preferable, especially where the distinction is clearly at issue, for the trial court to emphasize that in order for the jury to conclude that the defendant premeditated the killing it must find that the defendant had sufficient time to consider the decision whether or not to kill and weigh the reasons for or against

---

11. The decision in *Willey v. State*, 328 Md. 126, 613 A.2d 956 (1992), was rendered on October 13, 1992, and the instructions in the instant case were given to the jury on October 26, 1992.

such a choice." 328 Md. at 138, 613 A.2d at 961–62. We further stated that, " '[a]lthough time should not be a determining factor for deciding whether an intentional homicide is deliberate, time should not be irrelevant to the decision.' " 328 Md. at 139, 613 A.2d at 962 (quoting Leo M. Romero, *A Critique of the Willful, Deliberate, and Premeditated Formula For Distinguishing Between First and Second Degree Murder in New Mexico,* 18 N.M.L.Rev. 73, 86 (1988)).

The pertinent portion of the jury instructions at issue in *Willey* was as follows: " 'Premeditated means that the defendant thought about the killing and that there was time, though it need only have been brief, for the defendant to form the intent to kill.' " *Willey,* 328 Md. at 131, 613 A.2d at 958 (quoting the trial judge's instructions). In the first place, we specifically held that these instructions were sufficient to uphold the Defendant's conviction for first degree murder in *Willey.* 328 Md. at 138, 613 A.2d at 961. Secondly, Judge Whitfill told the jury in the instant case that, in order to find Baker guilty of first degree willful and premeditated murder, it must find that "the act causing the death was not committed suddenly, but, instead, was done after a conscious decision was made to carry out the act." The judge also informed the jury that "[p]remeditated means that the Defendant thought about the killing and that there was time, even if brief, for the Defendant to form the intent to kill." Finally, the jury was informed that a finding of premeditation also required the jury to find that the "conscious and deliberate intention to do the fatal act existed for an appreciable time before the act was done." These instructions provided sufficient clarification and emphasis of the premeditation element of first degree murder and, therefore, we reject Appellant's argument that the instructions were inconsistent with our decision in *Willey.* In light of these facts, we hold that there was no error, much less a plain error, on the part of the trial judge.

## B.

In Appellant's brief, he argues that, "[w]hile cases have stated that the nature of the injuries may provide evidence of

malice and that multiple wounds may provide evidence of premeditation based on the possibility of thought during the interval between the injuries imposed, this does not transfer to allowing an inference of premeditation from a single wound." Appellant concludes that "[a]llowing any inference of premeditation based on this single injury has no basis in Maryland law, before *Willey* or since." We do not agree with this contention.

There is ample precedent in this State supporting the conclusion that a specific intent to kill may be inferred from surrounding circumstances, including but not limited to the "use of a deadly weapon directed at a vital part of the human body." *State v. Raines*, 326 Md. 582, 591, 606 A.2d 265, 269, *cert. denied*, —— U.S. ——, 113 S.Ct. 390, 121 L.Ed.2d 299 (1992). It is not for an appellate court to determine whether the evidence supporting such an inference should or should not be believed; the appellate court may not substitute its own factual findings for those of the trial court. Instead, the standard of review applicable to the sufficiency of evidence necessary to support an inference of premeditation is " 'whether the record ... could reasonably support a finding of guilt beyond a reasonable doubt.' " *Raines*, 326 Md. at 588, 606 A.2d at 268 (quoting *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560, 573 (1979) (footnote omitted)). In making such a determination on appeal, we view the evidence in the light most favorable to the prosecution and decide whether " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Raines*, 326 Md. at 589, 606 A.2d at 268 (quoting *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573 (emphasis in original)). *See also Tichnell v. State*, 287 Md. 695, 717, 415 A.2d 830, 842 (1980) (explaining the standard established in *Jackson* ).

In *Raines*, the defendant shot the operator of a tractor-trailer while both were driving on the Baltimore beltway. The defendant had been drinking most of the day and was driving around firing a handgun out the window of the vehicle in

which he was a passenger. Even though he did not admit to deliberately firing the weapon at the window of the tractor-trailer, the Court of Appeals recognized that " '[s]ince intent is subjective and, without the cooperation of the accused, cannot be directly and objectively proven, its presence must be shown by established facts which permit a proper inference of its existence.' " *Raines*, 326 Md. at 591, 606 A.2d at 269 (quoting *State v. Earp*, 319 Md. 156, 167, 571 A.2d 1227, 1233 (1990), in turn quoting *Davis v. State*, 204 Md. 44, 51, 102 A.2d 816, 819 (1954)). The Court concluded that "Raines's actions in directing the gun at the window ... permitted an inference that Raines shot the gun with the intent to kill." 326 Md. at 592–93, 606 A.2d at 270.

■ Simply because a jury may find that a defendant could form the intent to kill in the time lapse between inflicting multiple wounds upon a victim, does not preclude an inference that this defendant formed the intent to kill prior to inflicting one deadly wound upon his victim. In the case before us, the jury could properly draw an inference of a premeditated and deliberate intent to kill from the evidence that Baker walked up to Ms. Tyson in a mall parking lot, placed a handgun up against her head and then pulled the trigger. Since such an inference was proper, the instruction supporting that inference was likewise proper, especially when taken in context of the entire body of jury instructions regarding premeditation and intent. *Raines*, 326 Md. at 591, 606 A.2d at 269 (stating that, "under the proper circumstances, an intent to kill may be inferred from the use of a deadly weapon directed at a vital part of the human body"). *See also Bruce v. State*, 218 Md. 87, 96, 145 A.2d 428, 433 (1958) (holding as proper a jury instruction that permitted inference of "specific intent to take life" from use of deadly weapon on vital part of victim's body). We therefore hold that the trial judge made no error in his jury instructions regarding first degree murder.[12]

---

12. We also note that, even if there was error in these jury instructions, Baker was also found guilty of First Degree Felony Murder, which independently suffices as a basis for imposition of the death penalty.

## V. Sufficiency of Evidence Regarding Principal in the First Degree

■ Appellant's final argument is that the evidence was insufficient to sustain a finding that he was a principal in the first degree. Under Maryland law, except in murder-for-hire cases, only those individuals found guilty of first degree murder as a principal in the first degree may be sentenced to death. *See* Md.Code (1957, 1992 Repl.Vol., 1993 Cum.Supp.), Art. 27, § 413(e)(1); *Booth v. State,* 327 Md. 142, 186, 608 A.2d 162, 183, *cert. denied,* —— U.S. ——, 113 S.Ct. 500, 121 L.Ed.2d 437 (1992).

■ As we previously stated, unless the factual findings of a trial court are clearly erroneous, they will not be disturbed by an appellate court. Likewise, an appellate court is not at liberty to substitute its own factual findings for those of a trial court where " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Raines,* 326 Md. at 589, 606 A.2d at 268 (quoting *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573 (emphasis in original)). *See also Barnhard v. State,* 325 Md. 602, 614–15, 602 A.2d 701, 707 (1992) (relying on *Jackson* as proper standard for reviewing sufficiency of evidence in a jury trial); *Wiggins v. State,* 324 Md. 551, 566–67, 597 A.2d 1359, 1366–67 (1991) (explaining that, in a non-jury, capital case, this Court will defer to the factual findings of the trial court, unless clearly erroneous, even if conviction is based on circumstantial evidence), *cert. denied,* —— U.S. ——, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992).

A rational trier of fact could have found beyond a reasonable doubt that Baker was a principal in the first degree based on the circumstantial evidence offered at trial. Baker's fingerprints were lifted from the driver's side window of Jane Tyson's car, and his fingerprints and a palm print were also found on the passenger side window of the blue Blazer. Scott Faust observed Baker in the passenger seat of the blue Blazer, just after he saw it drive away from the scene of the murder. Neither Gregory Lawrence's nor anyone else's fin-

gerprints were identified on Jane Tyson's car. It was also determined that Tyson's blood was discovered by the arresting officers on Baker's leg, sock, and shoe at the time of his arrest. Upon an inspection of Lawrence's clothing immediately after the shooting, no blood was found. Together with the testimony of Scott Faust and the stipulated, eyewitness testimony of Tyson's grandson, Adam, the evidence was sufficient to support a finding by a "rational trier of fact" that Baker was a principal in the first degree.

## VI.  Appropriateness of the Death Sentence

Finally, the evidence supports the trial court's finding that the aggravating circumstances outweighed any mitigating circumstances. We also conclude that Baker's death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Md.Code (1957, 1992 Repl.Vol., 1993 Cum.Supp.), Art. 27, § 414(e).

For these reasons, the trial court's imposition of the death sentence was appropriate under the law.

*JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY AFFIRMED.*