UNITED STATES of America,
Appellee,

v.

Sam ACCARDI, Appellant.

No. 316, Docket 29234.

United States Court of Appeals
Second Circuit.

Argued Jan. 26, 1965.

Decided March 10, 1965.

Peter Fleming, Jr., Asst. U. S. Atty., Southern District of New York (Robert M. Morgenthau, U. S. Atty., Southern District of New York, and Neal J. Hurwitz, Asst. U. S. Atty., on the brief), for appellee.

Jerome Lewis, Brooklyn, N. Y., for appellant.

Before WATERMAN, SMITH and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge.

The Government offered evidence to prove and the jury could reasonably have found that a narcotics agent, Anthony Zirilli, spoke with co-defendant, DiGregorio on January 4, 1955 concerning the purchase of heroin. On the afternoon of January 31, Zirilli met with Di-Gregorio and co-defendant Russo at a Brooklyn restaurant. After some discussion about prices, Zirilli agreed to purchase a one-half kilogram of heroin for $5,000. The transfer of heroin for cash was to be made that evening. During the course of the discussion, Russo indicated that he was not the source of supply, that he needed to travel some distance to get it and that he would therefore need an hour and a half after receiving the cash before he could deliver the heroin.

In the early evening, after the cash had been advanced, narcotics agents followed DiGregorio and Russo to the neighborhood where the appellant Accardi resided in Bloomfield, New Jersey. The agents then lost track of the car. Back in New York around 9 o'clock the same evening, Russo handed over the narcotics to Zirilli.

In February, Zirilli staged a party for a special employee of the Federal Bureau of Narcotics to which he invited DiGregorio and Russo. During the afternoon before the party Zirilli had informed Di-Gregorio that he was dissatisfied with the heroin because it had been diluted, and that he would like to take up the matter with the source of supply. At the party Russo inquired about the trouble and offered to call his supplier. He then placed a call to Accardi's number in Bloomfield. After the call he told Zirilli that his man had said that the heroin was "pure, unadulterated," but that he could return the heroin for a refund if he were still dissatisfied. The offer was declined on the ground that the stuff had already been sold. But on February 12th Zirilli told DiGregorio that the "first buy" was no good, and that in the future he wanted to deal directly with the source, who by now was referred to as Sam. Four days later, February 16th, a meeting between Zirilli and Accardi was arranged in Bloomfield. Accardi vouched for the quality of the heroin, said it was "95% pure," although "[his] man said it was only 75% pure." He assured Zirilli that everything would be all right on the next buy, and that he should deal with Russo and DiGregorio and return the heroin if he were dissatisfied with the quality in the future.

A sale of approximately one kilogram was consummated on February 18th. Accardi was observed as a participant in the transaction, though DiGregorio was the direct supplier.

Later in February and again in April Zirilli spoke to DiGregorio about a proposal to pick up heroin in Italy. As a result of these conversations Accardi met Zirilli in a Bloomfield gas station. They discussed and agreed upon a purchase

from Italy of ten kilograms of heroin for $40,000. Accardi agreed to write to his people in Europe to make the arrangements. On May 6, Zirilli was informed that Accardi received a letter from Italy refusing the proposal.

Accardi was arrested on August 3rd and indicted on August 15th. He pleaded not guilty to each count of the indictment and was released on bail in the amount of $75,000. He later failed to appear at a calendar call, and was next discovered in 1956 residing in Sicily. He was brought to the United States in custody in November 1963 under a Presidential warrant.

Accardi testified in his own defense. He denied knowing or meeting Zirilli at any time prior to trial. He admitted knowing Russo and DiGregorio,[1] but denied discussions with them concerning narcotics or participation with them in the delivery of narcotics. He admitted his 1955 flight, which he said was provoked by concern for a fair trial and fears for his safety which were engendered by the violent manner in which he claimed he was arrested. The arresting agents denied this account of the arrest and denied ever threatening or even seeing Accardi subsequent to his arrest.

Accardi was charged in a five count indictment. The jury found him guilty on the first count which alleged that on or about January 31, 1955 he received, concealed, sold and facilitated the transportation, concealment and sale of heroin in violation of 21 U.S.C. § 173 and § 174. It also found him guilty on the second count which charged that on or about January 31, 1955, he sold, dispensed and distributed heroin which was not from the original stamped package, in violation of 26 U.S.C. § 4704(a), § 4701, § 4703, § 4771(a) and § 7237(a). It convicted him on the third count which charged him with a violation of 21 U.S.C. § 173 and § 174, similar to that in Count One but in connection with the events of February 18, 1955. It also found him guilty on the

fifth count of conspiracy to violate the narcotics laws, 18 U.S.C. § 371.

Accardi has raised a large number of claimed points of error on this appeal, which essentially reduce themselves to the issues discussed.

He complains that the negative form of the definition of reasonable doubt given by the trial judge in his charge to the jury was improper and resulted in the denial of a fair trial. Accardi took no exception to that part of the charge which included the definition in question, and which was as follows:

"* * * A reasonable doubt is a doubt which is based upon reason. It is not a speculative doubt. It is a substantial doubt. It is that kind of doubt which would cause you to hesitate in the important matters of your life before you would take action. * * *"

This negative form of the definition of reasonable doubt was not only approved, but recommended by the Supreme Court in Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954). The appellant certainly suffered no prejudice in this regard.

He also complains that his conviction resulted from the admission into evidence of non-segregated hearsay testimony, under an erroneous theory of agency, and of matters beyond the scope of the indictment.

Much of the case against Accardi, especially with reference to the substantive counts, was based on Zirilli's testimony about the acts and declarations of DiGregorio and Russo. The trial judge admitted this testimony subject to connection, and he instructed the jury on each occasion that the acts and declarations of either DiGregorio or Russo were binding on Accardi only if Accardi's membership in the conspiracy was first established by independent evidence of Accardi's own acts and declarations made in furtherance of the conspiracy.

1. Russo and DiGregorio, who were charged as codefendants with Accardi in all five counts of the indictment, pleaded guilty to 3 counts in 1955. Counts 2 and 4 were dismissed upon consent of the Government.

■ Evidence of Accardi's acts and declarations established that the undisputed sales of heroin were made pursuant to a single comprehensive arrangement between Accardi, DiGregorio and Russo. For example, Accardi told Zirilli on February 16th that the narcotics had not been cut, that he had tested the heroin himself. When Zirilli asked Accardi who would be responsible for the "next buy," Accardi told him not to worry, to continue dealing with Russo and DiGregorio, and to return the narcotics for a refund if he were still unsatisfied. In addition to his role as a guarantor, Accardi was observed in Brooklyn on February 18th, the day of the second sale, meeting with DiGregorio immediately prior to the delivery of the heroin to Zirilli. There was also evidence of the meeting on April 28th, between Accardi and Zirilli at the Bloomfield gas station, at which the scheme for the direct importation of heroin through Accardi's contacts in Italy was discussed, which further underlined Accardi's dominant role in this criminal partnership. The evidence clearly established Accardi's awareness of and participation in the conspiracy that resulted in the two sales. His 1955 flight from prosecution was also evidence from which an inference of Accardi's consciousness of guilt could be drawn. United States v. Waldman, 240 F.2d 449, 451–452 (2d Cir. 1957). The rule is so well established that it is hardly necessary to repeat that the declarations of one conspirator may be used against another conspirator, not present, on the theory that the declarant is the agent of the other, and the admissions of one are admissible against both under a standard exception to the hearsay rule. Lutwak v. United States, 344 U.S. 604, 617, 73 S.Ct. 481, 97 L.Ed. 593 (1953).

■■ Moreover, evidence of acts and declarations of one conspirator, binding on a confederate on an agency theory, need not be confined to the conspiracy charge. Under the rule of this circuit such evidence is also competent to prove guilt of the substantive crimes. United States v. Campisi, 248 F.2d 102 (2d Cir.), cert. denied, 355 U.S. 892, 78 S.Ct. 266, 2 L.Ed.2d 191 (1957); United States v. Perillo, 164 F.2d 645 (2d Cir. 1947); United States v. Olweiss, 138 F.2d 798 (2d Cir. 1943), cert. denied, 321 U.S. 744, 64 S.Ct. 483, 88 L.Ed. 1047 (1944).

■ The appellant refers particularly to that part of the evidence on the conspiracy count which concerned events occurring after February 18th—e. g., Zirilli's discussion with the defendants in April about the plan to import heroin from Italy—and argues that it was improperly admitted because it worked a prejudicial variance in attempting to prove a separate conspiracy beyond the purview of the indictment. The indictment, however, charged that a conspiracy existed from on or about January 1, 1955 and continuously thereafter up to and including August 15, 1955, the date it was filed. The purpose of the conspiracy was to receive and distribute unlawfully acquired heroin; the creation of new sources of supply and new avenues of distribution were certainly related to that purpose. Such evidence was admissible as acts and declarations in furtherance of the conspiracy. Appellant argues that this plan was not in furtherance of the conspiracy charged, because on February 16th or at least on February 18th the investigative net had been closed around the defendants, marking the effective defeat of that conspiracy and nothing that occurred after that date could be in furtherance of it. See Lutwak v. United States, supra, 344 U.S. at 618, 73 S.Ct. 481. The short answer to this contention is that the conspiracy did not actually end until August 3rd when Accardi was arrested. Appellant cites no authority for the admittedly novel proposition that a conspiracy terminates when the "investigative net has been closed." He urges the court to make "new law" on this point. There is no merit to the claim and the court declines to adopt the proposal.

Accardi also claims as error the reception into evidence of incriminating statements, made after he was indicted and in the absence of his counsel, which he claims, in effect, deprived him of due

process of law and of his constitutional right of counsel.

On September 22nd, weeks after the indictment, Agent Belmont went to the Bloomfield gas station to serve a subpoena on Accardi's brother-in-law. Accardi was present, recognized Belmont and asked Belmont to help him; he told Belmont that the case has been "made up against him; that he had never sold narcotics." Belmont told him that the case against him was well-documented and that he could tell his story at trial. Accardi then admitted that he had met Truglio (Zirilli's cover name) with Russo and DiGregorio, but had "chased them" when they proposed to talk about narcotics.

Agent Belmont testified on rebuttal to this conversation to contradict, through evidence of a prior inconsistent statement, Accardi's own testimony that he had seen Zirilli for the first time when Zirilli testified at the trial. The only objection made by the defense to this evidence was that it was improper rebuttal. The objection now raised was not then made that the evidence was inadmissible under Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) or Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), although each of those cases had been decided prior to the trial.

In any event, the facts and circumstances of the present case are clearly distinguishable from Escobedo and Massiah. The conversation at the Bloomfield gas station was initiated entirely by Accardi as a protest of his innocence. There was no inducement offered him to make the statements, nor were they made because of any deception practiced upon him or through an attempt by Belmont to interrogate him. On the contrary, Accardi volunteered his statements to Belmont who had made the trip to Bloomfield for an entirely different reason, who encountered Accardi by chance and who did not ask Accardi a single question concerning the merits of the case.

The appellant does not claim that Accardi's statement to Belmont was other than voluntary nor does he claim that there was any interrogation or attempt at interrogation by the agent. The incident is, therefore, not within the prohibited area of post-indictment interrogation in the absence of defense counsel. United States v. Guerra, 334 F.2d 138 (2d Cir. 1964).

The Supreme Court said in Walder v. United States, 347 U.S. 62, 65, 74 S.Ct. 354, 356, 98 L.Ed. 503 (1954):

"[A defendant] * * * must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility."

See also, Tate v. United States, 283 F.2d 377 (D.C.Cir. 1960).

With regard to the penalties imposed by the trial court, the appellant argues that consecutive sentences of five years each on three counts is in effect double or triple punishment for a single offense, that of January 31st, 1955.

Appellant was convicted of violating several statutory controls devised by Congress for dealing with traffic in narcotics. Although the substantive offenses of which he was convicted and sentenced arose from a single transaction, the imposition of consecutive sentences was not error. Gore v. United States, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958); Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1931); nor was the imposition of a separate sentence for the conspiracy offense improper. See Pereira v. United States, 347 U.S. 1, 11, 74 S.Ct. 358, 98 L.Ed. 435 (1953).

There is no merit to this nor to any of the other points presented in the appeal. The judgment below is affirmed.