*604
 
 JAMES R. EYLER, Judge.
 

 A jury in the Circuit Court for Harford County convicted Michael Lee Baker, appellant, of first degree assault, second degree assault, and use of a handgun in the commission of a crime of violence. The trial court sentenced appellant to a term of twenty years’ incarceration with all but ten years suspended in favor of probation. Appellant presents six questions on appeal:
 

 I. Did the trial court err in refusing to propound appellant’s requested voir dire questions?
 

 II. Did the trial court err in permitting the State to question appellant as to whether he had made a handgun available to the police?
 

 III. Did the trial court err in denying appellant’s motion for a mistrial after the State asked a series of leading questions?
 

 IV. Did the trial court err in admitting evidence that appellant made a statement to a police officer for the alleged purpose of misleading the police?
 

 V. Did the trial court err in precluding a defense witness from testifying?
 

 VI. Did the trial court err in refusing to compel the State to investigate an allegation against the victim of appellant’s assault?
 

 We answer “yes” to questions I and IV and reverse the judgments of the circuit court. We do not reach questions II, III, and V, but we shall briefly address question VI.
 

 FACTS
 

 The charges in this case arose from a shooting in the early hours of June 23, 2001. Appellant did not deny that he shot Daniel Gray but claimed that he did so to defend his girlfriend, Gracia Kubanek, from a sexual assault by Gray, and in self-defense.
 

 Appellant and Kubanek met in Germany in 1997 while appellant was stationed there in the Army Reserves. Kuba
 
 *605
 
 nek owned a hair salon in Germany, and after appellant returned to the United States, he helped her establish a salon in Bel Air, Maryland. Kubanek traveled back and forth between Germany and Maryland to run both businesses. Appellant was the manager of the Maryland salon, had an office in the salon, and sometimes lived in the salon. Appellant was also Kubanek’s boyfriend, and he lived in her home when she was in Maryland.
 

 According to Kubanek,
 
 [1]
 
 on the night of June 22, 2001, she had dinner with a friend at Georgetown North, a restaurant and bar near her salon. Kubanek had two glasses of wine during dinner. Kubanek took her friend home and returned to the bar around midnight. Kubanek saw Daniel Gray, whom she knew as a customer of her salon, and the two started talking. Between midnight and 2:00 a.m., when the bar closed, Kubanek drank four or five whiskeys with coke.
 

 Kubanek and Gray left together when the bar closed and went to Gray’s house, where they stayed for about an hour. Kubanek testified that Gray made sexual advances, which she spurned, and she asked him to take her to the salon, intending to walk home from there.
 

 Gray denied making any sexual advances at his house and said that he told her he had to take her home because he had to get up early the next day.
 

 Gray drove Kubanek to the salon and went inside. According to Kubanek, he went inside to use the restroom. According to Gray, Kubanek invited him in.
 

 Kubanek related the following. Each sat in a chair and smoked a cigarette. After about ten minutes, Gray knelt in front of her chair, kissed her, pushed up her skirt, put his hands on her legs and touched her “entire body.” Kubanek told him no, and asked him to leave, but he did not move away from her. About five minutes later, appellant came into the store. Gray stood up. Appellant asked him what he was doing there, then twice told him to leave. A few seconds later,
 
 *606
 
 appellant shot Gray in the hand. Appellant then asked to see Gray’s identification, and Gray showed appellant his driver’s license. Appellant then let Gray leave.
 

 Kubanek acknowledged that, in her first statement to the police, she did not tell them about Gray touching her, and explained, “I could not talk about the thing for a long time because I was ashamed.”
 

 Gray testified to the following. When he emerged from the restroom, Kubanek was gathering items to take home, so he sat down and smoked a cigarette. Kubanek sat down, and Gray crossed the room to use an ashtray on the table next to her. He crouched down and rested his arms across her knees and kissed her. He had his hand on her leg and knee. Appellant entered the salon. He was very upset, and yelled and screamed at Kubanek. He told Gray that Kubanek was his woman, and Gray retorted, “It doesn’t appear so.” Appellant went behind one of the work stations in the rear of the salon and returned with a gun. He pointed the gun at Gray and shot him in the hand. Appellant then approached Gray, put the gun to his head, and threatened to kill him. Appellant locked the door and asked to see Gray’s driver’s license to find out who he was and where he lived. Appellant threatened that if he saw him again in the salon or talking to Kubanek, he would kill him. After Gray left the salon, he drove to the Bel Air Police Department, about half a mile away, and was taken to the hospital by ambulance.
 

 Appellant testified to the following. Around 4:00 A.M., he became worried because Kubanek was not home. There was no telephone in the house, so he went to the salon in case she needed to get in touch with him. When he arrived at the salon, he looked in the window and
 

 saw Mr. Gray in between Gracia’s legs, doing some action with his hands.... When I got to the glass door I saw his hands going up on both sides of her—he was on his knees, pushing her dress up to her buttocks, you could see her underwear. His head was in between her legs and he was
 
 *607
 
 on her left side, on the inside of her left side, going side to side and he was leaning into her.
 

 Appellant, who testified that he had been a police officer at one time, observed that
 

 I know what force is, he was holding her down, she was trying to push him off, and she was I guess just played out, you could see she was exhausted, I don’t know how long she had been in that situation.
 

 He said, “[S]he was doing the best she could, but it wasn’t much.”
 

 According to appellant, he entered the salon and said to Gray, “What are you doing here. That’s my woman.” Gray “went back down and put his hands on her again.” Kubanek told Gray to leave, but he did not, and appellant told him to leave. Appellant stated that he had been trained as a police officer to notice certain indications that people were going to become violent. He saw the indications in Gray, and he also noticed that Gray smelled of alcohol.
 

 Appellant explained that he wanted to get Gray away from Kubanek but was concerned that if he and Gray fought, one of them might fall on Kubanek or cause glass from shelving to shatter and injure her. Instead, appellant retrieved his weapon “to disengage [Gray’s] violence as quickly as possible.” After appellant retrieved the gun, Gray was still “in a hostile position.” Lest Gray think the gun was not real, appellant shot him in the hand.
 

 Appellant confirmed that he locked the door and asked to see Gray’s identification, explaining that, because he had used a handgun, he knew there would be a police investigation. He said that he thought that Gray was “some kind of sexual predator” and wanted the police to know his “method of operation.” After Gray showed him his driver’s license, he told Gray to leave.
 

 According to appellant, Kubanek was hysterical, and he was upset because he had never shot anyone before. He put the gun in his “office area” and left. He drove somewhere to
 
 *608
 
 think, passed out for a while, then ate breakfast and returned, intending to go to the police station. While he was walking to the police station, an officer arrested him.
 

 Additional facts will be set forth as needed in our discussion of the issues presented.
 

 DISCUSSION I. - Voir Dire
 

 At trial, appellant objected to the trial court’s failure to propound several
 
 voir dire
 
 questions he had requested:
 

 [Njumber 12 concerning the defendant’s election to testify on his own behalf, whether or not any of the people in voir dire would consider that he would be testifying truthfully because he’s on trial and would they be unable to weigh his testimony in the same manner as any other witness.
 

 Also Number 13, which states that the defendant has an absolute constitutional right not to testify and would you draw any inference of guilt from the defendant’s election not to testify or decision not to testify.
 

 Number 14 says that the State has the burden of proof to prove the defendant’s guilty beyond a reasonable doubt, the defendant does not have to prove his innocence. Would you draw any inference of guilt if this defendant elects not to present any testimony.
 

 Number 15, whether or not you would tend to view the testimony of witnesses called by the defense with more skepticism than those called by the State, merely because they were called by the defense.
 

 Number 17, if after hearing all the testimony of the State, you think that more likely than not the defendant is guilty, but you’re not convinced beyond a reasonable doubt of his guilt, would you have any difficulty in finding the defendant not guilty.
 

 Number 19, do you have any bias or prejudice concerning handguns which would prevent you from fairly weighing the evidence in this case.
 

 
 *609
 
 And finally, Number 20, is there anything about the nature of the allegations in this case which would prevent anyone from sitting as a juror.
 

 The trial court asked defense counsel if he wished to be heard “with respect to the failure of the court to issue those questions or the legal basis for your exceptions.” Counsel replied “not right now,” but requested that a copy of his proposed
 
 voir dire
 
 be put into the court’s file. The trial court told defense counsel that a copy was already in the court file and noted the exceptions.
 

 Appellant contends that the trial court erred in refusing to ask each of those
 
 voir dire
 
 questions. The State asserts that appellant waived the objections by not stating the grounds for his objection. The State also asserts that the trial court properly exercised its discretion in not asking the questions.
 

 Waiver
 

 In support of its contention that appellant failed to preserve the issue for our review, the State cites
 
 Walker v. State,
 
 338 Md. 253, 262, 658 A.2d 239,
 
 cert. denied,
 
 516 U.S. 898, 116 S.Ct. 254, 133 L.Ed.2d 179 (1995), for the rule that an appellate court ordinarily will not review an issue not presented to the trial court, and
 
 Bowman v. State,
 
 337 Md. 65, 69, 650 A.2d 954 (1994), and
 
 Leatherwood v. State,
 
 49 Md.App. 683, 694-95, 435 A.2d 477 (1981), for the rule that a party objecting to jury instructions must explain the grounds for the objection.
 
 Walker
 
 is not applicable because, as the transcript clearly shows, appellant did raise the issue in the trial court.
 
 Bowman
 
 and
 
 Leatherwood
 
 are not applicable because they concerned jury instructions which are governed by Rule 4-325. Rule 4-325(e) requires that a party “object!] on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection.” Rule 4-312, dealing with jury selection, contains no such requirement and is governed by Rule 4-323(c).
 
 See Newman v. State,
 
 156 Md.App. 20, 50-51, 845 A.2d 71 (2003). In contrast to Rule 4-325(e), Rule 4-323(c) provides that,
 

 
 *610
 
 it is sufficient that a party, at the time the ruling or order is made or sought, makes known to the court the action that the party desires the court to take or the objection to the action of the court. The grounds for the objection need not be stated unless these rules expressly provide otherwise or the court so directs.
 

 We noted this distinction in
 
 Stevenson v. State,
 
 94 Md.App. 715, 619 A.2d 155 (1993). Distinguishing cases involving the failure to object to jury instructions, we held that “[djefense counsel’s attempt to persuade the judge that this evidence was admissible was sufficient, under Md. Rule 4-323(c), to ‘make[ ] known to the court the action that the party desires the court to take,’ regardless of counsel’s acceptance of the judge’s ruling on the matter.”
 
 Stevenson,
 
 94 Md.App. at 721, 619 A.2d 155.
 

 In
 
 Newman
 
 we rejected the State’s contention that Newman had failed to preserve his objection to the trial court’s refusal to ask
 
 voir dire
 
 questions he requested. Noting that “Rules 4-323(c) and (d) govern the method of making objections to rulings or orders, other than evidentiary,” we held that counsel preserved the objection by making known to the trial court what he wanted done.
 
 [2]
 

 See also Bundy v. State,
 
 334 Md. 131, 638 A.2d 84 (1994) (Rule 4-323(c) was satisfied where “counsel’s statement put the trial judge on notice of her complaint that the State just exceeded its allotted number of peremptory challenges.”).
 

 Here, appellant told the trial court that he objected to its failure to ask his requested
 
 voir dire
 
 questions. The trial court asked appellant if he wished to be heard but did not direct him to state his grounds. The court also expressly noted the exceptions. The issue was properly preserved.
 

 Merits
 

 The scope of
 
 voir dire
 
 and the form of the questions propounded rest firmly within the discretion of the trial judge.
 
 *611
 

 Hill v. State,
 
 339 Md. 275, 279, 661 A.2d 1164 (1995);
 
 Davis v. State,
 
 333 Md. 27, 34, 633 A.2d 867 (1993). “The overriding principle or purpose” of
 
 voir dire
 
 is to ascertain “the existence of cause for disqualification.”
 
 Hill v. State,
 
 339 Md. at 279, 661 A.2d 1164 (citations omitted).
 

 There are two areas of inquiry that may uncover cause for disqualification: (1) an examination to determine whether prospective jurors meet the minimum statutory qualifications for jury service, and (2) “ ‘an examination of a juror ... conducted strictly within the right to discover the state of mind of the juror in respect to the matter in hand or any collateral matter
 
 reasonably liable
 
 to unduly influence him.’ ”
 
 Davis v. State,
 
 333 Md. at 35-36, 633 A.2d 867 (citations omitted) (emphasis added in
 
 Davis
 
 ). “[I]f a prospective juror is ‘unable to apply the law’ or ‘holds a particular belief ... that would affect his ability or disposition to consider the evidence fairly and impartially,’ he ‘should be excused for cause.’ ”
 
 Foster v. State,
 
 304 Md. 439, 454, 499 A.2d 1236 (1985) (citation omitted),
 
 reconsideration denied,
 
 305 Md. 306, 503 A.2d 1326,
 
 cert. denied,
 
 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986). In determining what questions are likely to uncover a cause for disqualification, “the questions should focus on issues particular to the defendant’s case so that biases directly related to the crime, the witnesses, or the defendant may be uncovered.”
 
 State v. Thomas,
 
 369 Md. 202, 207, 798 A.2d 566 (2002).
 

 The Specific Questions
 

 Questions 17 and 20:
 

 Number 17, if after hearing all the testimony of the State, you think that more likely than not the defendant is guilty, but you’re not convinced beyond a reasonable doubt of his guilt, would you have any difficulty in finding the defendant not guilty.
 

 And finally, Number 20, is there anything about the nature of the allegations in this case which would prevent anyone from sitting as a juror.
 

 
 *612
 
 The trial court did not ask those questions, but asked the jury panel:
 

 Now in this case, as in all criminal cases before the court, the defendant is presumed to be innocent of the charges unless and until proven guilty beyond a reasonable doubt. Now, is there any member of the jury panel who disagrees with that legal principle? If so, please stand.
 

 Now, does any member of the jury panel know of any other reason why you feel you could not sit as a juror in this case, listen to the evidence in this case, and render a fair and impartial verdict? If so please stand.
 

 We conclude that the trial court essentially asked the questions requested in numbers 17 and 20 and find no error in the trial court’s refusal to ask the questions in the words appellant suggested.
 

 Question 19:
 

 Number 19, do you have any bias or prejudice concerning handguns which would prevent you from fairly weighing the evidence in this case.
 

 The Court of Appeals has held that the trial court should ask questions aimed at uncovering a bias based on the nature of the crime with which the defendant is charged.
 
 See Sweet v. State,
 
 371 Md. 1, 9-10, 806 A.2d 265 (2002);
 
 Thomas,
 
 369 Md. at 214, 798 A.2d 566.
 

 In
 
 Thomas,
 
 the Court of Appeals held that the trial court abused its discretion by not asking on
 
 voir dire:
 

 Does any member of the jury panel have such strong feelings regarding violations of the narcotics laws that it would be difficult for you to fairly and impartially weigh the facts at a trial where narcotics violations have been alleged?
 

 369 Md. at 204, 798 A.2d 566. In
 
 Sweet,
 
 a case involving charges of assaulting and committing a second degree sexual offense against a minor (an 11-year old girl), the Court of Appeals held that the trial court abused its discretion in failing to ask the jury panel, “Do the charges stir up strong emotional feelings in you that would affect your ability to be fair and
 
 *613
 
 impartial in this case?,” 371 Md. at 9, 806 A.2d 265. The Court explained,
 

 The Court’s decision in petitioner’s case is essentially controlled by our recent decision in
 
 State v. Thomas,
 
 369 Md. 202, 798 A.2d 566 (2002). In that case, we held that it was an abuse of discretion for the trial court to refuse to ask the venire panel if any of them harbored “strong feelings regarding violations of the narcotics laws” in a trial in which the defendant was charged with possession and distribution of a controlled dangerous substance.
 
 See id.
 
 at 204, 798 A.2d at 567. We reasoned that the inquiry was directed at biases, specifically those related to Thomas’s alleged criminal act, that, if uncovered, would be disqualifying when they impaired the ability of the juror to be fair and impartial.
 
 See id.
 
 at 211, 798 A.2d at 571. The rationale of
 
 Thomas
 
 in this regard is fully applicable to the instant case.
 

 Id.
 
 at 9-10, 806 A.2d 265.
 

 Here, appellant shot an unarmed man with a handgun, allegedly in self-defense or defense of his girlfriend. One of the facts the jury might have to decide was whether appellant used reasonable force. The trial court should have asked whether any prospective juror had strong feelings about handguns that would have affected his or her ability to weigh the issues fairly.
 

 We disagree that the trial court’s asking the panel whether any juror belonged to “any organization that is concerned with victims’ rights or that is otherwise concerned with law enforcement issues” would reveal any jurors who had strong prejudice toward handguns, especially since the trial court specifically mentioned “MADD or SADD or organizations such as those.” Obviously, a person could have strong prejudice against handguns without joining an organization. There is no reason to believe it likely that such a person would have answered in the affirmative.
 

 Questions 12 and 15:
 

 [Njumber 12 concerning the defendant’s election to testify on his own behalf, whether or not any of the
 
 *614
 
 people in voir dire would consider that he would be testifying truthfully because he’s on trial and would they be unable to weigh his testimony in the same manner as any other witness.
 

 Number 15, whether or not you would tend to view the testimony of witnesses called by the defense with more skepticism than those called by the State, merely because they were called by the defense.
 

 In
 
 Bowie v. State,
 
 324 Md. 1, 595 A.2d 448 (1991), the trial court had refused to ask three
 
 voir dire
 
 questions requested by Bowie: whether a juror believes a police officer would be likely to tell the truth, whether a juror would believe a police officer more than a civilian witness, and whether a juror would “tend to view the testimony of witnesses called by the Defense with more skepticism than witnesses called by the State merely because they were called by the Defense.”
 
 Id.
 
 at 7, 595 A.2d 448. The Court concluded that the trial court had abused its discretion and committed reversible error in “refusing to address ... the issue raised by the three questions proposed by appellant[.]” Id. at 11, 595 A.2d 448.
 

 The State distinguishes the present case from
 
 Bowie
 
 because the trial court here did ask about police witnesses.
 
 Bowie
 
 indicates, however, that the concern extends to State’s witnesses other than police officers:
 

 The State’s final contention, that failure to inquire, if error, was harmless beyond a reasonable doubt, fares no better than its previous ones since it is based essentially on the arguments we have already rejected. We must add, however, that were the State correct with respect to the non-fact police witnesses (those who testified concerning the investigation of the crimes), the testimony of McDaniels (the fact witness) would remain an obstacle to a harmless error analysis. As to him, an issue of credibility was surely presented, namely, the reliability of his testimony. Moreover, to the extent that the State relies upon non-official witness testimony or the other police witnesses to corroborate McDaniels’ testimony, it overlooks question No. 3.
 
 *615
 
 That question is designed to discover those who would give greater weight to the testimony of the witnesses whom the State calls. That would include both the non-official witnesses,
 
 %.e.
 
 the victims and accomplice, as well as the non-fact police witnesses.
 

 824 Md. at 10-11, 595 A.2d 448.
 

 We agree with appellant that the trial court should have asked question 15. We reach a different conclusion with respect to question 12. In
 
 Bernadyn v. State,
 
 152 Md.App. 255, 283, 831 A.2d 532,
 
 cert. granted on other grounds,
 
 378 Md. 613, 837 A.2d 925 (2003), the trial court refused to ask whether the panel members would have a bias against the defendant’s testimony because he was accused of a crime and, therefore, give it less weight than the testimony of another witness. We found no abuse of discretion, noting
 

 that the court questioned the venire regarding biases in favor of or against the testimony of police officers. The issue was adequately addressed by the court. Second, the court asked the venire whether members would “tend to view the witnesses called by the defense with more or less skepticism than witnesses called by the State[.]” The question is a broader version of that requested by appellant. The actual question posed to the venire would reveal not only bias towards appellant’s testimony but also towards those witnesses testifying on appellant’s behalf.
 

 Bernadyn,
 
 152 Md.App. at 283-284, 831 A.2d 532. We agree. Having concluded that the trial court here should have addressed whether the jurors would give more weight to the State’s witnesses, we see no reason to require the additional question appellant requested.
 

 Questions 13 and 14:
 

 Also Number 13, which states that the defendant has an absolute constitutional right not to testify and would you draw any inference of guilt from the defendant’s election not to testify or decision not to testify.
 

 Number 14 says that the State has the burden of proof to prove the defendant’s guilty beyond a reasonable doubt, the
 
 *616
 
 defendant does not have to prove his innocence. Would you draw any inference of guilt if this defendant elects not to present any testimony.
 

 The trial court was not required to ask jurors whether they would draw an inference from the defendant’s election not to testify. In
 
 Twining v. State,
 
 284 Md. 97, 198 A.2d 291 (1964), the Court of Appeals rejected the contention that the jury should have been asked a question “related to whether the talismen would give the accused the benefit of the presumption of innocence and the burden of proof.”
 
 Id.
 
 at 100, 198 A.2d 291. The Court stated,
 

 The rules of law stated in the proposed questions were fully and fairly covered in subsequent instructions to the jury. It is generally recognized that it is inappropriate to instruct on the law at this stage of the case, or to question the jury as to whether or not they would be disposed to follow or apply stated rules of law.
 

 Id.
 

 This court reiterated that position in
 
 Carter v. State,
 
 66 Md.App. 567, 576-77, 505 A.2d 545 (1986). There, the trial court declined to propound a
 
 voir dire
 
 question to the jurors asking “whether they had any problem with the proposition that the mere fact that a person.has been charged with a crime is not evidence of guilt.”
 
 Id.
 
 at 576, 505 A.2d 545. We held that the question fell within the rule of
 
 Twining
 
 and that it was not an abuse of discretion for the trial court to have declined to ask it.
 
 Id.
 
 at 577, 505 A.2d 545.
 

 Similarly, in
 
 Wilson v. State,
 
 148 Md.App. 601, 656-57, 814 A.2d 1 (2002),
 
 cert. denied,
 
 374 Md. 82, 821 A.2d 370 (2003), this Court rejected Wilson’s and Bryant’s contentions that the trial court had abused its discretion by declining to ask the jury certain
 
 voir dire
 
 questions. One of the questions asked whether any member of the jury panel was unwilling or unable to abide by the rule that unless he or she was satisfied beyond a reasonable doubt of the defendant’s guilt based solely on the evidence, the presumption of innocence required them to find the defendant not guilty.
 
 Id.
 
 at 656, 814 A.2d 1. Another
 
 *617
 
 asked whether the juror would be able to decide the guilt or innocence of each defendant based solely on the evidence presented against that defendant.
 
 Id.
 
 We held that the questions “were not framed in a manner likely to expose biases, prejudices, or misconceptions of the jury panel.”
 
 Id.
 
 at 659, 814 A.2d 1. Noting that those questions “more closely resemble jury instructions rather than
 
 voir dire
 
 questions,” the Court followed the rule of
 
 Twining,
 
 holding that it was “inappropriate to instruct the jury on the law during
 
 voir dire
 
 or to question the jurors as to whether they would be disposed to follow or apply stated rules of law.”
 
 Id.
 
 at 660, 814 A.2d 1.
 

 Here, the trial court told the jury that appellant was presumed to be innocent, that the State had the burden of proving appellant’s guilt beyond a reasonable doubt, and that appellant was not required to prove his innocence. Although appellant asserts that the trial court should have asked the jurors whether they would hold it against him if he did not testify, this, too, would have been an appropriate jury instruction if he had not testified and if he had requested it.
 
 See
 
 MPJI-Cr 3:17 (The defendant has an absolute constitutional right not to testify and the jury must not consider or even discuss the fact that the defendant did not testify).
 

 As appellant notes, some courts have reached a different conclusion.
 
 See, e.g., State v. Cere,
 
 125 N.H. 421, 480 A.2d 195 (1984);
 
 People v. Zehr,
 
 103 Ill.2d 472, 83 Ill.Dec. 128, 469 N.E.2d 1062 (1984);
 
 State v. Lumumba,
 
 253 N.J.Super. 375, 601 A.2d 1178 (1992);
 
 Jones v. State,
 
 378 So.2d 797 (Fla.Dist.Ct.App.1980);
 
 United States v. Blount,
 
 479 F.2d 650 (6th Cir.1973). Other courts have reached the same conclusion as Maryland.
 
 See, e.g., Harper v. State,
 
 222 Ga.App. 393, 394, 474 S.E.2d 288, 289 (1996);
 
 State v. Dahlgren,
 
 200 Conn. 586, 602-03, 512 A.2d 906, 915 (1986);
 
 United States v. Beckman,
 
 222 F.3d 512, 519-20 (8th Cir.2000);
 
 United States v. Robinson,
 
 804 F.2d 280, 281 (4th Cir.1986);
 
 United States v. Miller,
 
 758 F.2d 570, 573 (11th Cir.),
 
 cert. denied,
 
 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985).
 

 
 *618
 
 In any event, it is up to the Court of Appeals, not this Court, to decide, as appellant suggests, that the reasoning of
 
 Twining
 
 is “now outmoded.”
 

 IV. - Violation Of Right To Counsel Background
 

 After appellant was charged, he was released on bail. He was represented by assigned counsel. Trial was originally scheduled for January, 2002, but was postponed, apparently for reasons unrelated to appellant or Kubanek, and reset for March 5, 2002. On March 1, 2002, Detective Edward Smith, the lead investigator in the case, went into Kubanek’s salon looking for her. She was not there, but appellant was. Smith asked appellant if he knew where Kubanek was, and appellant replied that she was out with friends.
 

 Kubanek did not appear to testify on March 5, 2002. The prosecutor proffered to Judge Waldron that the State was having a problem with Kubanek’s cooperation “from the very start of this case,” and had “anticipated something like this happening.” He said that he had served her with a subpoena in January, while she was present at a prior proceeding.
 
 [3]
 

 Defense counsel proffered that Kubanek had been present on the prior trial date but that she had returned to Germany and that she had decided not to come back. Defense counsel further proffered that he tried to have Kubanek return for trial, but he did not think she would. The State thus learned that appellant had known on March 1st that Kubanek was not “out with friends,” but was in Germany. Judge Waldron issued a bench warrant for her arrest.
 

 The parties proceeded to the postponement court. The prosecutor proffered that the police had been looking for Kubanek all week, and that, before the previously scheduled trial date, she had not returned until the day before trial, and they had not had a chance to talk to her. He “suggested” to
 
 *619
 
 the postponement court that “there were considerable efforts by the defendant to conceal this witness or keep her out of the State’s grasp in some way.” The court granted a postponement.
 

 Kubanek returned in April, after a police officer assured her that she would not be arrested.
 

 At trial, the State attempted to show that appellant had tried to influence Kubanek’s testimony and that he had tried to “hide” Kubanek from the State. Smith was the first witness to be called. When the prosecutor began to inquire about Smith’s March 1, 2002 contact with appellant, defense counsel objected, based on relevancy. The prosecutor argued that the testimony was relevant because it showed an attempt to conceal a witness and was indicative of consciousness of guilt. The trial court agreed that it was relevant, noting that “this is not the first time I’ve heard of it and not the first time you’ve heard of it. You heard it in my chambers. He’s been beefing about this ever since this case started.” It commented, “This issue is going to run throughout this trial.”
 

 Smith was permitted to testify that appellant told him that Kubanek was out with friends. Defense counsel objected again, and asked the trial court to reconsider the issue, this time based on Smith’s approaching appellant and asking him a question while appellant was represented by counsel. Defense counsel explained that there had been no motion to suppress on the issue because he had never been told the State intended to use the statement at trial. Counsel also objected to the discovery violation. The State proffered that Smith had not sought out appellant, but that he had gone to the salon, and “by happenstance,” appellant was there, and Smith asked him if he knew where Kubanek was. The prosecutor proffered that “it wasn’t a pre-planned interrogation.” The trial court agreed to hear argument the next morning.
 

 Following argument, the trial court agreed that the State had committed a discovery violation, but concluded that appellant was not prejudiced because, to that point there had been no follow-up testimony that would indicate that appellant’s
 
 *620
 
 statement was false. Counsel then argued the issue of whether the State had violated appellant’s Sixth Amendment right to counsel. Defense counsel argued that Smith knew that appellant was represented and that the question about Kubanek was “all about this case against my client.” The prosecutor agreed that there were instances in which police were not permitted to have contact with a defendant, but that it was “crime specific.” Relying on
 
 State v. Blizzard,
 
 278 Md. 556, 366 A.2d 1026 (1976), and
 
 United States v. Accardi,
 
 342 F.2d 697 (2d Cir.1965), the trial court concluded that the rule was aimed “at a rather narrow situation where, after indictment, law enforcement authorities deliberately elicited incriminating statements from the defendant by direct interrogation or by other illegal means.” It said that asking appellant about Kubanek’s whereabouts was not an interrogation, but only asking a question of general knowledge, which “did not focus on the defendant’s guilt or innocence in this case,” and that appellant “voluntarily replied.” He held the statement to be admissible.
 

 At trial, the prosecutor elicited information from Kubanek about her relationship with appellant. Kubanek’s testimony revealed that she and appellant were in contact even while she was in Germany. She reported that they did not discuss whether she could come back to testify, but that after March 5th, appellant did not want her to come back because she would be arrested. She acknowledged that the previous night she had told Detective Smith that appellant had told her that if she did not come back, it might help him get the case dismissed. She also testified that appellant had taken the furniture from the salon and told her that if she did not return, he would give her back her equipment.
 

 On cross-examination, Kubanek testified that she had been present for the scheduled trial in January, which had been postponed. She explained that after the trial date was postponed, she went to Germany, because she had problems unrelated to appellant or this case. She reported that she had been subpoenaed by both parties for the March 5th trial. She said that appellant wanted her to return and testify at the
 
 *621
 
 March 5th trial, but that she could not because of business and family problems in Germany. She acknowledged that after March 5th, appellant did not want her to return, but explained that it was because the judge had issued a bench warrant and she would be arrested. She said that she returned when a police officer assured her she would not be arrested if she returned.
 

 The Parties’ Contentions
 

 Appellant argues that the trial court erred in refusing to suppress his response to Detective Smith’s question. He asserts that the question was “designed to further the effort to prosecute [appellant],” and that “[a]n incriminating response could easily be anticipated.” The State responds that the trial court properly exercised its discretion and that appellant was neither in custody nor subjected to “interrogation,” and appellant’s comment was “not made in response to police interrogation.”
 

 Sixth Amendment Right To Counsel
 

 In
 
 Massiah v. United States,
 
 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the government obtained incriminating statements by Massiah after he had retained a lawyer and was released on bail. Colson, one of Massiah’s codefendants, allowed a government agent to place a radio transmitter under the front seat of his car so that the agent could listen to conversations taking place in the car.
 
 See Id.
 
 at 202-03, 84 S.Ct. 1199. Massiah and Colson had a discussion in the car, and, by prearrangement with Colson, the agent was listening in a nearby car.
 
 Id.
 
 at 203, 84 S.Ct. 1199. Massiah made incriminating statements during the conversation, and the agent was permitted to testify about them.
 
 Id.
 
 Massiah was convicted of several offenses, and the Court of Appeals affirmed the convictions.
 
 Id.
 
 The United States Supreme Court reversed the convictions, holding that Massiah “was denied the basic protections of [the Sixth Amendment] guarantee when there was used against him at his trial, evidence of his own incriminating words, which federal agents had deliber
 
 *622
 
 ately elicited from him after he had been indicated and in the absence of his counsel.”
 
 Id.
 
 at 206, 84 S.Ct. 1199.
 

 Similarly,
 
 United States v. Accardi,
 
 342 F.2d 697 (2d Cir.1965) involved a defendant charged with violations of the narcotics laws and conspiracy to violate the narcotics laws. In
 
 Accardi
 
 a government agent named Belmont went to a gas station to serve a subpoena on Accardi’s brother-in-law.
 
 Id.
 
 at 701. Accardi approached Belmont and asked for help, but Belmont told him that he could tell his story at trial. Accardi admitted to Belmont that he had met with his alleged co-conspirators, but denied that he had discussed narcotics with them. Id. At trial, Accardi testified that he had never met a co-conspirator until that individual testified at his trial.
 
 Id.
 
 Belmont testified in rebuttal about Accardi’s admission to him.
 
 Id.
 
 The court distinguished the situation from
 
 Massiah
 
 on the ground that Accardi had initiated the conversation with Belmont, “who had made the trip to Bloomfield for an entirely different reason, who encountered Accardi by chance, and who did not ask Accardi a single question concerning the merits of the case.”
 
 Id.
 

 The Maryland Court of Appeals considered the scope of
 
 Massiah
 
 in
 
 State v. Blizzard,
 
 278 Md. 556, 366 A.2d 1026 (1976). There, Sergeant Zero testified about statements Blizzard made to him at the jail where Blizzard was incarcerated.
 
 Id.
 
 at 560, 366 A.2d 1026. Zero maintained that he went to the jail after someone at the jail had called and told him that Blizzard and another prisoner wanted to speak to another police officer.
 
 Id.
 
 He reported that when he first spoke to Blizzard, he told Blizzard that he did not want to talk to him about the robbery for which he was incarcerated because he had him “up tight in this armed robbery,” and that Blizzard replied that he knew it, but wanted to speak to him about other cases.
 
 Id.
 
 at 560, 366 A.2d 1026. The Court of Appeals, after reviewing the cases decided under
 
 Massiah,
 
 held
 
 Massiah
 
 to be inapplicable.
 
 Id.
 
 at 563-574, 366 A.2d 1026. It noted that many of the cases indicated that the statement had to be “deliberately elicited” by “direct interrogation or by surreptitious means,” and that it did not apply to spontaneous, un
 
 *623
 
 tricked, uncoerced voluntary statements made to the police.
 
 Id.
 
 at 562-74, 366 A.2d 1026. Concluding that the testimony at issue fell “far short of an incriminating statement by the accused!,]” and that “[t]here is not the slightest hint that trickery or cajolery was in any way used by the police officer,!”] the Court “[did] not perceive Blizzard to have been denied the right of counsel.”
 
 Id.
 
 at 575, 366 A.2d 1026.
 

 In
 
 United States v. Henry,
 
 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), the United States Supreme Court considered whether a government agent had “deliberately elicited” incriminating statements from Henry by placing a paid informant in a position near Henry while Henry was incarcerated. Although the agent who placed the informant near Henry maintained that he did not intend that the informant would “take affirmative steps to secure incriminating information,” the informant was to be paid only if he produced useful information. The Court affirmed the Court of Appeals’ conclusion that the agent had deliberately elicited the statements:
 

 Nichols had been a paid Government informant for more than a year; moreover, the FBI agent was aware that Nichols had access to Henry and would be able to engage him in conversations without arousing Henry’s suspicion. The arrangement between Nichols and the agent was on a contingent-fee basis; Nichols was to be paid only if he produced useful information. This combination of circumstances is sufficient to support the Court of Appeals’ determination. Even if the agent’s statement that he did not intend that Nichols would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result.
 

 Id.
 
 at 270-71, 100 S.Ct. 2183 (internal footnote omitted). It concluded:
 

 Under the strictures of the Court’s holdings on the exclusion of evidence, we conclude that the Court of Appeals did not err in holding that Henry’s statements to Nichols should not have been admitted at trial. By intentionally creating a situation likely to induce Henry to make incriminating state-
 
 *624
 
 merits without the assistance of counsel, the Government violated Henry’s Sixth Amendment right to counsel.
 

 Id.
 
 at 274, 100 S.Ct. 2183.
 

 The Court addressed the issue again in
 
 Maine v. Moulton,
 
 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985).
 
 Moulton
 
 involved a codefendant, coincidentally named Colson, who had decided to cooperate with the police by recording telephone conversations with Moulton.
 
 Id.
 
 at 163-64, 106 S.Ct. 477. Colson also agreed, at the request of the police, to wear a body wire at a meeting with Moulton.
 
 Id.
 
 at 164-65, 106 S.Ct. 477. This was partly motivated by concern for Colson’s safety, as well as to record conversations about threats to witnesses.
 
 Id.
 
 at 165, 106 S.Ct. 477. The police told Colson not to attempt to question Moulton, but during the conversation he did ask Moulton to remind him of details of events, as a result of which Moulton made incriminating statements.
 
 Id.
 
 at 165-66, 106 S.Ct. 477. At trial, the State introduced evidence of the tapes, which included incriminating statements regarding the original theft charges and a portion of a discussion about developing false testimony.
 
 Id.
 
 at 167, 106 S.Ct. 477. The Maine Supreme Judicial Court agreed that the admission of the statements violated Moulton’s Sixth Amendment right to counsel, and held that the State could not use recordings of conversations where the State “knew or should have known” that Moulton would make incriminating statements regarding the pending charges.
 
 Id.
 
 at 168, 106 S.Ct. 477. The United States Supreme Court affirmed the state court’s decision. Recognizing the importance of the right to counsel, the Court noted:
 

 Once the right to counsel has attached and been asserted, the State must of course honor it. This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused’s choice to seek this assistance. We have on several occasions been called upon to clarify the scope of the State’s obligation in this regard, and have made clear that, at the very least, the prosecutor and
 
 *625
 
 police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.
 

 Id.
 
 at 170-71, 106 S.Ct. 477 (internal footnote omitted). It rejected the State’s contention that the Sixth Amendment was violated only when the police, rather than the defendant, set up the confrontation at which the statements were elicited, because,
 

 [t]he Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a “medium” between him and the State. As noted above, this guarantee includes the State’s affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused’s right to the assistance of counsel must be made in light of this obligation. Thus, the Sixth Amendment is not violated whenever—by luck or happenstance— the State obtains incriminating statements from the accused after the right to counsel has attached.
 
 See Henry,
 
 447 U.S., at 276, 100 S.Ct., at 2189 (POWELL, J., concurring). However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State’s obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused’s right to have counsel present in a confrontation between the accused and a state agent.
 

 Id.
 
 at 176, 106 S.Ct. 477. Acknowledging the need for continued investigation of suspected criminal activities, the Court limited the application of the rule to suppressing “incriminating statements pertaining to pending charges ... at the trial of those charges.”
 
 Id.
 
 at 180, 106 S.Ct. 477.
 

 In
 
 Kuhlmann v. Wilson,
 
 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), the Court expounded upon the meaning of
 
 *626
 
 “luck or happenstance.” There, the police placed an informant in a cell with Wilson, who was charged with robbing a taxicab garage and killing the night dispatcher.
 
 Id.
 
 at 439, 106 S.Ct. 2616. They instructed him not to question Wilson, but to “keep his ears open” for the names of Wilson’s confederates.
 
 Id.
 
 After a few days, Wilson described the crime to the informant and admitted that he and two other men had robbed the garage and murdered the dispatcher.
 
 Id.
 
 at 440, 106 S.Ct. 2616. The trial court found that Wilson’s statements were “spontaneous” and “unsolicited” and were admissible at Wilson’s trial.
 
 Id.
 

 Although the major conclusion of the Court was that the Court of Appeals erred in holding that the District Court should have considered Wilson’s successive habeas corpus petition, the Court also discussed the merits of Wilson’s claim for relief. It held that “the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.” 477 U.S. at 459, 106 S.Ct. 2616.
 

 Although Massiah;
 
 Henry,
 
 and
 
 Moulton
 
 involved information elicited by police informants, the Sixth Amendment violation is not based on the “surreptitious” nature of the confrontation. The Sixth Amendment right to counsel is applicable in situations involving police interrogation as well.
 
 See Michigan v. Jackson,
 
 475 U.S. 625, 636, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986)(police-initiated interrogation of a defendant who has asserted his right to counsel is a violation of his Sixth Amendment rights);
 
 Brewer v. Williams,
 
 430 U.S. 387, 400, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977)(“That the incriminating statements were elicited surreptitiously in the
 
 Massiah
 
 case, and otherwise here, is constitutionally irrelevant.”).
 

 In
 
 Garner v. State,
 
 142 Md.App. 94, 788 A.2d 219,
 
 cert. denied,
 
 369 Md. 181, 798 A.2d 553 (2002), this Court held that the police had violated Garner’s right to counsel by questioning him outside the presence of his attorney:
 

 As it has been interpreted by the courts, the Sixth Amendment of the United States Constitution prohibits, absent a
 
 *627
 
 waiver, the admission of a statement by a criminal defendant when the statement is made (1) outside the presence of legal counsel; (2) in response to interrogation by the State; and (3) after the right to counsel has attached with respect to the charge being tried.
 
 See generally Maine v. Moulton,
 
 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985);
 
 United States v. Henry,
 
 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980);
 
 Massiah v. United States,
 
 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964);
 
 Whittlesey v. State,
 
 340 Md. 30, 665 A.2d 223 (1995),
 
 cert. denied,
 
 516 U.S. 1148, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996).
 

 Id.
 
 at 106, 788 A.2d 219 (quoting
 
 Conyers v. State,
 
 354 Md. 132, 192, 729 A.2d 910 (1999)).
 

 This Case
 

 The trial court found that Smith did not go into the salon to question appellant but saw him by chance. It also concluded that Smith did not ask a question dealing with the defendant’s guilt or innocence in this case. Based on those findings, it concluded that appellant’s statement was voluntary and was admissible.
 

 The trial court’s focus on why Smith went to the salon was misdirected. It does not matter that Smith did not go to the salon intending to question appellant, because “knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State’s obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity.”
 
 Moulton,
 
 474 U.S. at 176, 106 S.Ct. 477. Although, as the State asserts in its brief, this was a “chance encounter,” Smith exploited the encounter and made a purposeful decision to ask appellant a question. Unlike in
 
 Kuhlmann,
 
 appellant’s statement was not “spontaneous” or “unsolicited,” but was a response to Smith’s question.
 

 We also think that the trial court viewed Smith’s inquiry too narrowly when it concluded that it was not an “interrogation.” As one commentator points out, “Both
 
 Massiah
 
 and
 
 [Brewer
 
 
 *628
 

 v.] Williams,
 
 at some point refer to the police conduct as ‘interrogation’ but the facts of those cases make it clear that this does not mean interrogation in the narrow sense of the word.”
 
 See
 
 2 Wayne R. LaFave, Jerold H. Israel, and Nancy J. King,
 
 Criminal Procedure,
 
 § 6.4(g) (1999).
 
 Massiah, Henry, Moulton,
 
 and
 
 Wilson
 
 indicate that a government agent violates a defendant’s Sixth Amendment right to counsel if he or she deliberately elicits incriminating information.
 
 See Massiah,
 
 377 U.S. at 203, 84 S.Ct. 1199;
 
 Henry,
 
 447 U.S. at 270, 100 S.Ct. 2183;
 
 Moulton,
 
 474 U.S. at 175, 106 S.Ct. 477;
 
 Kuhlmann,
 
 477 U.S. at 459, 106 S.Ct. 2616.
 
 Massiah
 
 and
 
 Moulton
 
 also make clear that it is not necessary that the defendant be in custody.
 

 Smith deliberately asked the question that produced the incriminating response.
 

 Direct proof of the State’s knowledge -will seldom be available to the accused. However, as
 
 Henry
 
 makes clear, proof that the State “must have known” that its agent was likely to obtain incriminating statements from the accused in the absence of counsel suffices to establish a Sixth Amendment violation.
 

 Moulton,
 
 474 U.S. at 176, 106 S.Ct. 477.
 

 Here, there is no question that, long before March 1st, the State was alleging that appellant had tried to prevent it from speaking with Kubanek. The prosecutor said as much at the March 5th postponement hearing. The judge who granted the postponement was the same judge who presided at trial, and he noted that the State had been “beefing about this ever since this case started.” Given the State’s assertion that “there were considerable efforts by the defendant to conceal this witness or keep her out to the State’s grasp in some way,” Smith should have reasonably expected that appellant would disavow knowledge of Kubanek’s whereabouts or otherwise refuse to help him find her, either of which could be used to support the State’s assertion that appellant was “concealing” Kubanek.
 

 
 *629
 
 The trial court also viewed appellant’s right to counsel too narrowly when it determined that the question “did not focus on the defendant’s guilt or innocence in this case, but merely asked the whereabouts of another witness, of a witness in this case.” Even information that a defendant believes is exculpatory, if used in an incriminating manner, is “incriminating” information.
 

 The United States Supreme Court has reaffirmed that the Sixth Amendment right to counsel is offense specific. In
 
 McNeil v. Wisconsin,
 
 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), the Court held that McNeil’s right to counsel, which had attached with respect to an armed robbery, did not extend to a burglary, murder, and attempted murder occurring in a different crime.
 
 Id.
 
 at 173-74, 111 S.Ct. 2204. In
 
 Texas v. Cobb,
 
 532 U.S. 162, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001), the Court held that Cobb’s right to counsel, which had attached with respect to a burglary for which he had been indicted, did not extend to murders for which he had not been indicted, despite the fact that he committed the murders during the course of the burglary.
 
 Id.
 
 at 174, 121 S.Ct. 1335. Here, however, the evidence was used to show consciousness of guilt about the shooting for which appellant was represented. In
 
 Moulton,
 
 part of what was held to be improperly admitted was a discussion of developing false testimony, not just the facts of the offenses for which Moulton had been charged.
 
 See Moulton,
 
 474 U.S. at 167, 106 S.Ct. 477. In fact, the trial court here ruled that appellant’s statement was relevant to appellant’s guilt in this case when defense counsel initially objected to its admission.
 

 We agree with appellant that Smith’s question to him was a violation of his Sixth Amendment right to counsel and that his response to Smith should have been suppressed.
 

 V. - Investigation Of Kubanek’s Complaint
 

 Appellant, without transcript or record references, complains that the trial court denied his motion “asserting that the State was obstructing justice by refusing to follow up on Gracia Kubanek’s report that she had been sexually assaulted
 
 *630
 
 by Daniel Gray.” He alleges that “nothing was done about [the assault]” “for the apparent purpose of focusing upon the prosecution of Mr. Baker.”
 

 Appellant is apparently referring to a “Pro Se Motion For Trial Attorney Retainment, Judicial Review of Pre Trial Due Process, And Court Ordered Subpoenas and Disclosure,” in which appellant charges,
 
 inter alia,
 
 that the State’s Attorney ordered the police not to take a statement from Kubanek. Appellant also refers to the testimony of Michael May, an attorney who accompanied Kubanek to the police station, in support of his allegation. We note, first, that it is unclear from the appellant’s motion precisely what relief he was requesting from the court.
 

 In addition, as the State points out, appellant has provided no factual support for his allegation that the State did not investigate Kubanek’s claim. May testified that, after speaking on the telephone, Smith stopped taking a report from Kubanek. May also said, however, that he understood that the State’s Attorney would be speaking to Kubanek about the report, and that he did not know what later contact had taken place.
 

 In addition, appellant does not explain what exculpatory evidence an investigation would have produced. Even if the investigators believed appellant, their opinions would not be admissible evidence.
 
 See Casey v. State,
 
 124 Md.App. 331, 339, 722 A.2d 385 (1999). Appellant, Kubanek, and Gray, the only individuals with first-hand knowledge of the incident, all testified, and the jury was able to consider each witness’s version of events.
 

 JUDGMENTS REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR HARFORD COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.
 

 COSTS TO BE PAID BY HARFORD COUNTY.
 

 [1]
 

 . Kubanek testified through a German interpreter.
 

 [2]
 

 . Rule 4-323(d) provides: A formal exception to a ruling or order of the court is not necessary.
 

 [3]
 

 . Apparently inconsistent with the proffer, Smith testified that he had gone to the salon on March 1st to serve Kubanek with a subpoena.